UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN GREENFUELS ROCKWOOD (TENNESSEE), LLC, | Case No. 1:21-cv-07680-DLC |
| Plaintiff, | |
| -against- | |
| AIK CHUAN CONSTRUCTION PTE. LTD., | |
| Defendant. | |

AIK CHUAN CONSTRUCTION PTE. LTD.,

Counterclaim Plaintiff,

-against-

AMERICAN GREENFUELS ROCKWOOD
(TENNESSEE), LLC and KOLMAR AMERICAS, INC.

Counterclaim Defendants.

**DEFENDANT AND COUNTERCLAIM PLAINTIFF
AIK CHUAN CONSTRUCTION PTE. LTD.'S RESPONSE IN OPPOSITION TO
AMERICAN GREENFUELS ROCKWOOD (TENNESSEE), LLC'S AND KOLMAR
AMERICAS, INC.'S PRETRIAL MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page**

I.   **Kolmar Did Not Comply with the Subordination Agreement Or the Implied Duty of Good Faith and Fair Dealing Because Kolmar Manufactured Fictious Events of Default Under the Loan Agreement and Conducted a Commercially Unreasonable Foreclosure Sale** ................................................................................................ 2

    A.   The Court Should Summarily Reject Kolmar's Recycled Legal Arguments That This Court Has Already Rejected as a Matter of Law ................................... 2

    B.   Kolmar Did Not Comply with the Subordination Agreement or the Implied Duty of Good Faith and Fair Dealing Because It Manufactured Fictious Events of Default ............................................................................................ 6

    C.   Kolmar Did Not Comply with the Subordination Agreement or the Implied Duty of Good Faith and Fair Dealing Because Its Foreclosure Sale Did Not Comply with the Law .............................................................................. 9

        1.   Kolmar's Choice of Law Analysis Ignores the Plain Language of the Governing Agreements and How AGF Conducted the Foreclosure Sale .................................................................................................. 9

        2.   Kolmar's Interpretation Of Tennessee Real Property Law Is Wrong And Ignores Several Key Principles And Authorities ............................. 11

        3.   Under Either the UCC or Tennessee Real Property Law, the Foreclosure Sale Was Not Commercially Reasonable and Did Not Achieve Fair Market Value for the Plant .................................................. 14

        4.   Kolmar's Arguments That the Rockwood Plant Was Not a "Going Concern" and Cannot Be Valued Based on Future Revenue Projections Are Contrary to Law and Wrong .................................... 16

II.  **Kolmar Completely Mischaracterizes Aik Chuan's Tortious Interference Counterclaim** ............................................................................................................ 22

    A.   Kolmar Ignores that Aik Chuan's Tortious Interference Claim is Based on the Promissory Notes, Not Some "Prospective" Agreement Between Global and Some Third Party ........................................................................................ 22

    B.   The Economic Interest Defense is Not Available to Kolmar as a Matter of Law and the Facts Do Not Support its Application to AGF ................................. 23

**CONCLUSION** ................................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*Am. Railcar Indus., Inc. v. GyanSys, Inc.*,
   No. 14-cv-8533 (JSR), 2017 WL 11501888 (S.D.N.Y. Nov. 14, 2017) ...................................9

*Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*,
   No. 14-cv-6640(FPG), 2016 WL 2622013 (W.D.N.Y. May 5, 2016)..............................24, 25

*Bensen v. Am. Ultramar Ltd.*,
   No. 92-cv4420(KMW)(NRB), 1996 WL 422262 (S.D.N.Y. July 29, 1996) ...........................4

*Branch Banking and Trust Co. v. Hill*,
   582 S.W.3d 221 (Tenn. Ct. App. 2019)...................................................................13

*Cadence Bank, N.A. v. Latting Rd. Partners, LLC*,
   699 F. Supp. 2d 1033 (W.D. Tenn. 2010)...............................................................13

*Cap. Bank v. Brock*, No. E2013-01140-COA-R3CV,
   2014 WL 2993844 (Tenn. Ct. App. June 30, 2014) ...............................................12

*Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*,
   887 F. Supp. 2d 459 (E.D.N.Y. 2012) ....................................................................24

*EPAC Techs. Ltd. V. Interforum S.A.*,
   193 N.Y.S.3d 3 (1st Dep't 2023) ............................................................................24

*First Heritage Nat. Bank v. Keith*,
   902 F.2d 33 (6th Cir. 1990) ......................................................................................3

*GLC-South Hillsboro, LLC, v. Washington County Assessor*,
   TC-MD 180141R, 2021 WL 2290314 (Or. T.C. June 4, 2021) ...............................22

*Holt v. Citizens Central Bank*,
   688 S.W.2d 414 (Tenn. Ct. App. 1984)..................................................................13

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   No. 16-cv-2767(GBD), 2019 WL 1649983 (S.D.N.Y. Mar. 28, 2019)....................24

*In re Adler, Coleman Clearing Corp.*,
   247 B.R. 51 (Bankr. S.D.N.Y. 1999)......................................................................17

*In re Flagstaff Foodservice Corp.*,
   56 B.R. 899 (Bankr. S.D.N.Y. 1986)......................................................................17

*In re Waste Mgmt. Data Breach Litig.*,
   No. 21-CV-6147 (DLC), 2022 WL 561734 (S.D.N.Y. Feb. 24, 2022) ...................10

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
   29 F.4th 118 (2d Cir. 2022) ............................................................3, 5

*KLS Diversified Master Fund, L.P. v. McDevitt*,
   532 F. Supp. 3d 126 (S.D.N.Y. 2021)...........................................................3

*Lightbox Ventures, LLC v. 3rd Home Ltd.*,
   No. 16-cv-2379(DLC), 2017 WL 5312187 (S.D.N.Y Nov. 13, 2017)..........................18, 19

*Nebraska Nutrients, Inc. v. Shepherd*,
   626 N.W.2d 472 (Neb. 2001)...................................................................20, 21, 22

*New Pacific Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*,
   No. 99-cv-2436(DLC), 1999 WL 285493 (S.D.N.Y. May 6, 1999) .................................18

*Random Ventures, Inc. v. Advanced Armament Corp., LLC*,
   No. 12-cv-6792(KBF), 2014 WL 113745 (S.D.N.Y. Jan. 13, 2014)................................3

*Smith v. Hughes*,
   639 S.W.3d 627, (Tenn. Ct. App. 2021) .........................................................12

*Terrene Invs. v. C.I.R.*,
   94 T.C.M. (CCH), 2007 WL 2254734 (T.C. 2007)...................................................22

*Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*,
   No. 12-CV-5212 RA, 2015 WL 5752595 (S.D.N.Y. Sept. 30, 2015)..................................3

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
   8 N.Y.3d 422 (N.Y. 2007) .......................................................................24

## **Statutes**

N.Y. U.C.C. Law § 9-604(a)(2) ....................................................................10

N.Y. U.C.C. Law § 9-604(b)(2) ....................................................................10

Tenn. Code Ann. § 35-5-117(b) .................................................................11, 13

Tenn. Code Ann. § 35-5-117(c) ....................................................................11

Tenn. Code Ann. § 35-5-118 .......................................................................11

Tenn. Code Ann. § 47-9-604(a)(2) .................................................................10

Tenn. Code Ann. § 47-9-604(b)(2) .................................................................10

**<u>Other Authorities</u>**

Aswath Damodaran, *Valuing Young, Start-up and Growth Companies: Estimation
Issues and Valuation Challenges* (May 2009)........................................................................20

Pursuant to this Court's Individual Practices in Civil Cases § 6.D.iii, Defendant and Counterclaim Plaintiff Aik Chuan Construction Pte. Ltd. ("Aik Chuan") submits this response to the Pretrial Memorandum of Law ("Pretrial Memo," Dkt. 107), submitted by American GreenFuels Rockwood (Tennessee), LLC ("AGF") and Kolmar Americas, Inc. (together with AGF, "Kolmar")[1] to address certain unanticipated—and improper—legal arguments that Kolmar makes without any credible support in the record or applicable law.  Perhaps most surprising, many of Kolmar's legal arguments are based on interpretations of the governing financing and security agreements that this Court has already rejected as a matter of law in its September 30, 2022 Order (Dkt. 62) on Kolmar's motion to dismiss.  Kolmar's Pretrial Memo also contains a flawed choice of law analysis on the standards that govern the Foreclosure Sale and Kolmar then compounds that error by misinterpreting and misapplying the (Tennessee) law it exclusively relies upon.

Finally, Aik Chuan submits this response to address Kolmar's various "straw man" legal arguments, especially concerning Aik Chuan's tortious interference counterclaim, which Kolmar's Pretrial Memo mischaracterizes beyond all recognition from the one (accurately) described in this Court's Order on Kolmar's motion to dismiss and in Aik Chuan's amended counterclaims.  Dkt. 62 at 22-25.  Although it is possible Kolmar's arguments have some colorable relevance to the straw man tortious interference claim described in its Pretrial Memo, that claim bears no resemblance to the one Aik Chuan has actually asserted here or that will be the subject of Aik Chuan's proof at trial.

---

[1] Because each AGF party witness in this case had a job title at Kolmar, Aik Chuan uses the party names "AGF" and "Kolmar" interchangeably, except where distinguishing between the two entities is material to a specific document only one of the corporate entities signed (such as the Loan Agreement) or where their separateness is relevant to Aik Chuan's theory of liability and/or recoverable remedies (e.g., Kolmar is potentially liable for tortious interference, but not breach of contract because Kolmar has no contractual relationship with Aik Chuan).

I.     **Kolmar Did Not Comply with the Subordination Agreement Or the Implied Duty of Good Faith and Fair Dealing Because Kolmar Manufactured Fictious Events of Default Under the Loan Agreement and Conducted a Commercially Unreasonable Foreclosure Sale**

A.     **The Court Should Summarily Reject Kolmar's Recycled Legal Arguments That This Court Has Already Rejected as a Matter of Law**

Kolmar's Pretrial Memo is long on over-the-top rhetoric, but short on legal arguments that this Court has not already considered and rejected.  With respect to Aik Chuan's breach claims, Kolmar repeats its erroneous argument that Aik Chuan **had** to assume Global Energy's obligations under the Loan Agreement and thus **had** to pay the outstanding debt owed to Kolmar simply because Kolmar declared an Event of Default.  Dkt. 107 at 2.  As this Court has ruled, the Subordination Agreement does not say that.  Instead, "the Subordination Agreement imposes obligations on Aik Chuan to accept the GreenFuels Loan in exchange for the outstanding debt only '**if** an Event of Default occurs' – not merely if GreenFuels declares an Event of Default."  Dkt. 62 at 15 (emphasis added).

Similarly, Kolmar's Pretrial Memo crop quotes 7 pages of "relevant contract provisions" which Kolmar claims "eviscerate Aik Chuan's purported defenses."  *See* Dkt. 107 at 7-14.  But this is an argument retreading the same interpretations of the financing agreements that the Court has already ruled are not right.  Kolmar's reiterated argument here, essentially a "cut and paste" from Kolmar's failed motion to dismiss, is that the operative agreements are written such that, regardless of how Kolmar conducted the foreclosure sale, Aik Chuan essentially "stipulated" in advance that the sale would be commercially reasonable.  *Id.*  But Kolmar argued for the same interpretation of those provisions in its motions to dismiss, and the Court disagreed.  *See* Dkt. 62 at 13-20 (rejecting each of Kolmar's arguments pertaining to Aik Chuan's breach claims, including relating to provisions within the various financing agreements, and denying Kolmar's motion to dismiss such claims).  The agreements still require Kolmar to comply with applicable law and the

2

very provisions Kolmar cites say that explicitly.  *See, e.g.*, Dkt. 107 at 12 (citing Sec. 9.3 of the

Pledge and Security Agreement); Def. Ex. 376 (Pledge and Security Agreement, Sec. 9.3 at

AGFK_000279) ("In addition to exercise the other rights and remedies set forth herein, Lender

may, **to the extent permitted by applicable law**, arrange for and conduct a sale of the Collateral at

a public or private sale (as Lender may elect), which sale may be conducted by an employee or

representative of Lender, and any such sale shall be considered or deemed to be a sale made in a

commercially reasonable manner." (emphasis added)).[2]

With respect to Aik Chuan's claims for breach of the implied covenant of good faith and

fair dealing, Kolmar similarly rehashes the same stale and unsuccessful legal arguments.  Dkt. 107

at 25-28.  *First*, contrary to Kolmar's arguments that Aik Chuan's claims for breach of the implied

covenant of good faith and fair dealing are "superfluous" and based on *pleadings* that contain

"sparse allegations" (*id.* at 25-26), the Court here has already ruled just the opposite: that Aik

Chuan "adequately pled in the alternative a claim for breach of the implied covenant of good faith

and fair dealing."  Dkt. 62, at 15, 17-19 (denying Kolmar's motion to dismiss); *id.* at 13-14

(summarizing Aik Chuan's allegations and finding Aik Chuan sufficiently alleged that AGF

"injured Aik Chuan's ability to assert its rights under the Subordination Agreement, and that

[AGF] violated Aik Chuan's 'reasonable expectations' under the Subordination Agreement."

(quoting *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir.

2022))); *Random Ventures, Inc. v. Advanced Armament Corp.*, LLC, No. 12-cv-6792(KBF), 2014

---

[2]  Kolmar's arguments also fail because, under both Tennessee and New York UCC law, "a purported waiver of the right to commercially reasonable disposition of collateral is invalid[.]"  *Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*, No. 12-CV-5212 RA, 2015 WL 5752595, at *13 n.12 (S.D.N.Y. Sept. 30, 2015); *KLS Diversified Master Fund, L.P. v. McDevitt*, 532 F. Supp. 3d 126, 136 n.3 (S.D.N.Y. 2021) (recognizing waivers of other defenses, except that "[a] guarantor cannot contractually waive the defense that a sale was not commercially reasonable.") (subsequent history omitted); *First Heritage Nat. Bank v. Keith*, 902 F.2d 33 (6th Cir. 1990) (same under Tennessee law).  A discussion of why the UCC applies to some of the collateral AGF sold here is discussed, *infra*, at Section I(C)(1).

WL 113745, at *48 (S.D.N.Y. Jan. 13, 2014) (finding "plaintiffs' claim that defendant breached the covenant of good faith and fair dealing is separate from their breach of contract claim.").

*Second*, Kolmar inaccurately suggests, again contrary to this Court's prior Order, that Aik Chuan's claims are based upon its reasonable expectations under the Financing Documents.  Not so.  As the Court recognized, "Aik Chuan's claims for breach of the implied covenant . . . allege a breach of the duty *implied in the Subordination Agreement*, and not any third-party contract."  Dkt. 62 at 20 (emphasis added).

*Third*, another recycled (and misguided) argument in Kolmar's Pretrial Memo is that Aik Chuan's implied covenant claims impose additional obligations or duties beyond the Financing Documents because it had "the right to foreclose on the Rockwood site" after Events of Default under the Loan Agreement, and it did so "in total and strict compliance with the express terms of the Financing Documents," requiring Aik Chuan to assume the Outstanding Indebtedness.[3]  Dkt. 107 at 25, 28; *id.* at 3 n.3.  But that argument ignores that, as this Court expressly recognized, Aik Chuan's "reasonable expectation" under the Subordination Agreement was that Kolmar would only declare an Event of Default if an Event of Default *actually* occurred, "not ***merely*** if [AGF] declares an Event of Default to have occurred."  Dkt. 62 at 15 (emphasis added).

*Fourth*, Kolmar's rehashed arguments ignore this Court's ruling that Aik Chuan's claims do "not require [Aik Chuan] to allege" or prove "noncompliance with the law" or the "Financing Documents" because the implied covenant is "breached when a party to a contract violates the

---

[3] Kolmar relies on an email from Aik Chuan's Singaporean transactional counsel, dated June 7, 2021, which reads that "Aik Chuan <u>must</u> (it is not an option, but an obligation) assume the indebtedness under the loan agreements" as proof that Aik Chuan could not challenge whether it was obligated to assume the Outstanding Debt.  *E.g.*, Dkt. 107 at 17, 28 (citing Pl. Ex. 117).  Not only is this email drafted by a non-U.S. transactional lawyer, but the email is at odds with this Court's Order that denied Kolmar's motion to dismiss, and at odds with the facts and allegations as they have developed *since* June 7, 2021.  The Court should disregard this document as having little probative value and inadmissible "to the extent [it] contain[s] lawyers' opinions on legal issues."  *Bensen v. Am. Ultramar Ltd.*, No. 92-cv-4420(KMW)(NRB), 1996 WL 422262, at *12-14 (S.D.N.Y. July 29, 1996) (subsequent history omitted).

other party's 'reasonable expectations' or unreasonably attempts to frustrate the other party's ability to 'receive the fruits of the contract.'"[4] Dkt. 62 at 18 (quoting *JN Contemporary Art LLC*, 29 F.4th at 128). Consistent with that ruling, whether Aik Chuan "read the Financing Documents" or not (Dkt. 107 at 28) is irrelevant because Aik Chuan's reasonable expectations arise *under the Subordination Agreement*, not the Financing Documents or Loan Agreement. And under the Section 2.7 of the Subordination Agreement, Aik Chuan knew that AGF was obligated to apply any proceeds from "any distribution, division, or application, . . . voluntary or **involuntary**, by operation of law or otherwise, of all or any part of the assets of [Global Energy] or the proceeds thereof, . . . or upon the sale of all or substantially all of the Subordinated Debtor's assets" first to satisfy all the alleged Outstanding Indebtedness and then **distribute any surplus** to Aik Chuan in satisfaction of the Subordinated Obligations (the Promissory Notes) or, in the alternative, to Global Energy who, in turn, was contractually obligated to pay back those same obligations to Aik Chuan. *See* Def. Ex. 379, at 7, § 2.7 (emphasis added). Accordingly, as this Court found, Aik Chuan could "reasonably expect[ ] that [AGF] would attempt to maximize the value of the foreclosure sale, and [AGF's] failure to do so" could have "caused greater expenses for Aik Chuan under the contract." Dkt. 62 at 18-19. To be sure, Aik Chuan still needs to prove those expectations at trial and that AGF violated those expectations, but Kolmar's suggestion that Aik Chuan could not conceivably have had any such expectations is wrong and contrary to this Court's prior Order finding Aik Chuan's claim for breach of the implied duty of good faith and fair dealing plausible at the pleading stage.

---

[4] The "reasonable expectation" argument is entirely applicable, including because it was explicitly incorporated by the Court. *Compare* Dkt. 107 at 28 n.23, *with* Dkt. No. 62 at 13-14, 18.

**B.    Kolmar Did Not Comply with the Subordination Agreement or the Implied Duty of Good Faith and Fair Dealing Because It Manufactured Fictious Events of Default.**

Kolmar urges this Court to apply the wrong legal framework when it inaccurately describes this case as a "straightforward contract dispute" notwithstanding its 31-page legal memorandum and more than 500 trial exhibits.  As set forth above, the governing documents and law require this Court to scrutinize the evidence at trial and determine if there was: (i) a valid Event of Default; and (ii) a foreclosure sale that complied with applicable law.

Here, Kolmar was so eager to capture the significant financial potential presented by the Rockwood Plant that it hatched a scheme to acquire the plant for itself at all costs—or, as it turned out, at nearly no cost.  To effectuate that scheme, Kolmar manufactured ***three*** fictious Events of Default that could be used as pretext for initiating foreclose proceedings.  Dkt. 99, FoF ¶¶ 97-98, 122-123.  Kolmar has voluntarily capitulated on two of the three: one prior to litigation and one by virtue of Kolmar no longer arguing it as a valid default in its Pretrial Memo.  *E.g.*, Dkt. 107 at 14 n.11.

The first came in March 2021.  Global Energy, having run out of working capital, attempted to negotiate a pre-sale of its renewable diesel to BP, who was interested in paying $1.5 million for fuel that it would receive from Global Energy at a later date.  Dkt. 99, FoF ¶¶ 97-98.  Kolmar ultimately blocked the deal by claiming that Global Energy breached its confidentiality obligations under its offtake agreement with Kolmar, which Kolmar claimed also constituted a breach of the loan agreement.  Ultimately, Kolmar took no action on this default, apparently realizing it would not withstand scrutiny.

The second and third alleged defaults underpin the core of Kolmar's complaint against Aik Chuan here.  *See* Dkt. 1 ¶¶ 16-18.  On June 3, 2021, Kolmar issued a notice of default stating that: (1) Global Energy failed to maintain a $50,000 minimum account balance in accordance with the

loan agreement; and (2) it failed to achieve Verification (i.e. criteria that included producing 75% of Module 2's design capacity of renewable diesel) by the Target Verification Date (i.e. May 31, 2021).   Dkt. 99, FoF ¶¶ 122-123.   But because the evidence elicited during discovery overwhelmingly proved that Kolmar waived the minimum account balance default, Kolmar's Pretrial Memo effectively concedes that default and places all of Kolmar's eggs in the alleged "Verification" default basket.  Dkt. 107 at 14, n. 11.  But Kolmar's last standing alleged Default is just as fictious as the other two Kolmar has voluntarily abandoned, and likewise just pretext for Kolmar's plan to acquire the Rockwood Plant without Global Energy's consent.

The parties do not dispute that the Rockwood Plant had operational issues during the 16 months that Global Energy owned it.   But Kolmar also cannot credibly dispute that Proton Power's[5] underlying technology of converting wood biomass into an on-spec, drop-in renewable diesel worked.   Numerous independent third parties have confirmed as much, including the U.S. Internal Revenue Service and the U.K. Department for Transport, as well as TechnipFMC who Kolmar hired as a trusted contractor to bring the plant to commercialization after Kolmar purchased the plant in foreclosure.[6]  Dkt. 99, FoF ¶¶ 23-25, 76-77.

The parties also do not dispute that a Verification Test did not occur under the loan agreement at any point in time.  Dkt. 99, FoF ¶¶ 130-131.  This was *a prerequisite to any default claim that Global Energy didn't achieve Verification by the Verification Date*.  Dkt. 99, FoF ¶¶ 59-66.  Kolmar's *only* response is that a test was unnecessary or "futile" because everyone knew that the Rockwood Plant couldn't pass it.  It bears emphasis, however, that Global Energy never waived the requirement for such a test to take place to determine whether it was (or was not) in

---

[5] Proton Power, Inc. is the company that created the wood pyrolysis technology operating at the Rockwood Plant to generate renewable diesel.
[6] Technip confirmed that Proton Power's pyrolysis technology worked back in 2018, even before Global Energy purchased the Rockwood Plant from Aik Chuan.

default under the loan agreement.  Indeed, even if the Rockwood Plant had been operating perfectly in accordance with Kolmar's expectations, Kolmar would nevertheless have had the right to conduct the Verification Testing to confirm that the heavily negotiated (and technical) provisions of the loan agreement had been satisfied.  Kolmar was required to abide by those same rules and standards, especially because the consequences for failing the Test were so potentially drastic: Kolmar could remove Global Energy's President and CEO, foreclose on the plant, and sell it.  Dkt. 99, FoF ¶¶ 137-156.  And that is precisely what Kolmar did without running a single test.  The financing agreements do not say that Kolmar may invoke its most punitive and drastic remedies if everyone "thinks" or "believes" the Rockwood Plant is unlikely to pass the Verification Test. Instead, those documents require the failure of a specifically described technical test, for 30 continuous days, before Kolmar may declare a Verification Event of Default.  The Court will not hear any evidence that any such test ever happened.

Kolmar's actions here are akin to a teacher giving a student an F on the final exam because allegedly nobody "thinks" the student will pass.  Even in the absence of specific contractual requirements directly addressing the precise nature of the test and the criteria for failure—unlike here, where there *are* such requirements—no reasonable teacher would do so.  This would be especially true if the teacher also postponed the final and agreed to a study plan that would give the student more time (and potentially a greater ability) to pass the test (which, as explained immediately below, is precisely analogous to what Kolmar did here).

The evidence at trial will demonstrate that parties were not concerned with conducting a Verification Test because Kolmar's conduct effectively postponed and waived the Verification Date so that Global could focus on fixing certain operational issues.  More specifically, Kolmar, Global Energy, and Proton Power all met in April 2021 to discuss solutions to the Rockwood

Plant's issues that would allow the plant to achieve Verification. Dkt. 99, FoF ¶¶ 86-92. This plan included a timeline for part fabrication that stretched to the end of May with a full installation not possible until sometime in June, at the earliest. At no point during that meeting or at any other time did Kolmar mention that the 30-day continuous Verification Testing must commence by May 1, 2021 or be completed by May 31, 2021 (i.e. the Verification Date) or Global Energy would be in default. Kolmar cannot on the one hand agree to a plan to reach Verification that could not be fully implemented until June (at the earliest) and, on the other, claim a default because Verification did not occur by the end of May.

This is also why Kolmar's reliance on the 'futility doctrine" for the first time as part its Pretrial Memo does not work either. Kolmar's joint "efforts to move" the "deadline," before Global Energy "had even missed it, through a joint replanning exercise, . . . demonstrates [an] intent to waive the [ ] deadline for [Global Energy's] performance[.]" *Am. Railcar Indus., Inc. v. GyanSys, Inc.*, No. 14-cv-8533 (JSR), 2017 WL 11501888, at *6 (S.D.N.Y. Nov. 14, 2017). In this way, the Verification Test was, by definition, not futile. In fact, the parties all reasonably believed at the time that the identified solutions would work, thereby potentially paving the way for passing the Verification Test at some point in the near future. Dkt. 99, FoF ¶¶ 86-92.

### C. Kolmar Did Not Comply with the Subordination Agreement or the Implied Duty of Good Faith and Fair Dealing Because Its Foreclosure Sale Did Not Comply with the Law.

#### 1. Kolmar's Choice of Law Analysis Ignores the Plain Language of the Governing Agreements and How AGF Conducted the Foreclosure Sale.

Kolmar's choice of law "analysis" in its Pretrial Memo can best be described as cherry-picking and relying on certain contractual provisions while ignoring others that squarely support the application of the Uniform Commercial Code ("UCC") to the personal property collateral, including the valuable equipment and machinery sold here.

Contrary to Kolmar's suggestion, neither the Deed of Trust nor Security Agreement set out "what is required for the sale" under Tennessee law and neither agreement references a right to conduct a "foreclosure sale" or "how the foreclosure process must take place." *Cf.*, Dkt. 107 at 17. Rather, both the Deed of Trust and the Security Agreement provide that in an Event of Default, AGF may conduct a "sale" either (i) in accordance with the laws of the State of Tennessee (Def. Ex. 377, at 15, § 5.02(b)) or; (ii) to the extent permitted by applicable law (Def. Ex. 376, at 25, § 9.3). But the balance of the Deed of Trust and the entire Security Agreement are governed by New York law. And, significantly, the Security Agreement covers personal property (i.e., non-real estate) collateral and is subject to the UCC, a body of law expressly referenced approximately 40 times throughout that Agreement. In contrast, the enforcement of a "lien and security interest" created by the Deed of Trust is governed by Tennessee law.[7] *See* Security Agreement, Def. Ex. 376, § 11.8; *see generally id.*; Deed of Trust, Def Ex. 377, § 6.08.

While Kolmar is right that a secured party "may proceed" as to both personal and real property "in accordance with the rights with respect to the real property" under both New York's and Tennessee's versions of the UCC,[8] that is ***not*** what AGF elected to do here. *Cf.* Dkt. 107 at 18, 21-22; *see* Tenn. Code Ann. § 47-9-604(a)(2) and N.Y. U.C.C. Law § 9-604(a)(2); *See also* Tenn. Code Ann. § 47-9-604(b)(2) (same for security agreements covering real property and fixtures); N.Y. U.C.C. Law § 9-604(b)(2) (same). Specifically, Kolmar purposefully and intentionally noticed the foreclosure sale as a "Foreclosure Notice **and** UCC Sale." Def. Ex. 104.

---

[7] The Deed of Trust creates a "security agreement" only as to "personal property within the meaning of the Uniform Commercial Code or other law with respect to the Personalty, Improvements, Fixtures, Leases, Rents, Records, Property Agreements," that is defined in the Deed of Trust as "UCC Collateral." UCC Collateral does not include the land. *See* Deed of Trust, Def. Ex. 377, at 4-6 (defining Personalty, Improvements, Fixtures, Leases, Rents, Records, etc.); *id.* at 11, § 4.01.

[8] The Court need not engage in a choice-of-law analysis as to the UCC because New York and Tennessee law are substantially similar and do not conflict. *In re Waste Mgmt. Data Breach Litig.*, No. 21-CV-6147 (DLC), 2022 WL 561734, at *2 (S.D.N.Y. Feb. 24, 2022) ("A court need not engage in choice-of-law analysis if there is no 'actual conflict between the laws of the jurisdictions involved.'" (citation omitted)).

Because AGF sold all of the assets in a single sale, two differing bodies of law apply to that sale: Tennessee real property law applies to the land (under the Deed of Trust) and the UCC applies to the personal property (under the Deed of Trust **and** Security Agreement).

Aik Chuan's analysis of the UCC's standard of commercial reasonableness and how it applies to the facts here is set forth in Dkt. 99, CoL ¶¶ 247-264.  But even if Tennessee real property law alone governed the Rockwood Plant sale (and it does not), Kolmar misinterprets and misapplies that law.

> **2.      Kolmar's Interpretation Of Tennessee Real Property Law Is Wrong And Ignores Several Key Principles And Authorities**

AGF and Kolmar's analysis of Tennessee real property law is fundamentally flawed because it fails to recognize the distinction between: (1) whether the statutory presumption of fair value applies *at all*, and (2) whether Aik Chuan can overcome the rebuttable presumption if it applies.  *Compare* Dkt. 107 at 23 *with* Tenn. Code Ann. § 35-5-117(b) (stating the circumstances in which the rebuttable presumption applies)[9] *and* Tenn. Code Ann. § 35-5-117(c) (stating the circumstances in which a party may overcome the rebuttable presumption).

In the former scenario, AGF is **not** entitled to the rebuttable presumption **at all** if Aik Chuan shows "fraud, collusion, misconduct, or irregularity in the sale process."  Tenn. Code Ann. § 35-5-117(b).  In the latter scenario, where the "rebuttable prima facie presumption" applies, Aik Chuan may "overcome the presumption" by establishing "by a preponderance of the evidence that the property sold for an amount materially less than fair market value at the time of the foreclosure sale."  Tenn. Code Ann. § 35-5-117(c).  AGF improperly conflates these standards, suggesting wrongly that Aik Chuan may only overcome the rebuttable presumption by establishing "fraud,

---

[9] Per WestLaw, Tenn. Code Ann. § 35-5-117 was formerly Tenn. Code Ann. § 35-5-118.

collusion, misconduct, or irregularity." Dkt. 107 at 23. This interpretation finds no support in the law.

Regardless, however, AGF is not entitled to the rebuttable presumption that $1.7 million constituted fair market value for the Rockwood Property. Specifically, Kolmar incorrectly suggests, without any legal authority, that technical "compliance with the Tennessee Code in marketing and conducting the foreclosure sale" somehow immunizes the sale from any possible finding of "fraud, collusion, misconduct, or irregularity" in the sale process.[10] *See* Dkt. 107 at 22-23. Importantly, however, Kolmar does essentially concede, as it must, that AGF is *not* entitled to the presumption of fair market value where "irregularity, misconduct, fraud, or unfairness [] ***contributed to the inadequate [sale] price***." Dkt. 107 at 23 (emphasis added) (citing *Smith v. Hughes*, 639 S.W.3d 627, 647 (Tenn. Ct. App. 2021), an action to set aside a foreclosure and not an action to recover a deficiency judgment); *accord Cap. Bank v. Brock*, No. E2013-01140-COA-R3CV, 2014 WL 2993844, at *7 (Tenn. Ct. App. June 30, 2014) (suggesting that "proof that [the foreclosing party] acted in any way to negatively impact the foreclosure sale price" could constitute collusion, irregularity, fraud, or misconduct in the foreclosure sale process).

Here, that is precisely what Aik Chuan contends and will prove at trial: that AGF cannot be entitled to the statutory presumption of fair market value because AGF's and Kolmar's conduct *directly and "negatively impact[ed]* the foreclosure sale price." Specifically, AGF declared fictitious events of default to engineer a scenario by which AGF would be the only bidder at the foreclosure sale and where AGF would acquire the plant for substantially below fair market value. *Cf. Cap. Bank*, 2014 WL 2993844, at *7. AGF accomplished that result through self-dealing, *i.e.*,

---

[10] Kolmar also admittedly *did not* satisfy "all the requirements with respect to the contents of the foreclosure sale notice," Dkt. 107 at 19, because it did not provide any formal notice of the foreclosure sale to USP&E which had a lien against the property. *See, e.g.*, *id.* at 19 n.16.

collusion, by purposefully misrepresenting and inadequately describing the Rockwood Plant and equipment in the foreclosure notice, and by intentionally choosing not to market the foreclosure in any manner that would render fair market value (or decrease the likelihood that AGF became the sole bidder), *i.e.*, prime examples of misconduct and irregularities.  Accordingly, Kolmar is not entitled to the rebuttable prima facie presumption that the sale price of the property is equal to $1.7 million.  Tenn. Code Ann. § 35-5-117(b).

Starting at page 22 of its Pretrial Memo, AGF and Kolmar cite a series of cases that do not apply here because Aik Chuan is not arguing that the rebuttable presumption does not apply *solely* based on the shockingly inadequate foreclosure sale price.  Dkt. 107 at 22-23 (citing *Branch Banking and Trust Co. v. Hill*, 582 S.W.3d 221, 232, 239 (Tenn. Ct. App. 2019) (stating debtors ***did not*** "expressly allege[] fraud, collusion, misconduct, or irregularity in the foreclosure sale process," and analyzing whether debtors waived arguments as to the "adequacy of the foreclosure sale price"); *Cadence Bank, N.A. v. Latting Rd. Partners, LLC*, 699 F. Supp. 2d 1033, 1039 (W.D. Tenn. 2010) (noting that the "***sole argument*** is that [the] foreclosure sale yielded an unfair purchase price" (emphasis added))).  AGF also quotes from *Holt v. Citizens Central Bank*, 688 S.W.2d 414 (Tenn. Ct. App. 1984)—an action to set aside a foreclosure and decided decades before codification of the relevant statute here (Tenn. Code Ann. § 35-5-117)—for the proposition that property that sells for "one-half of its true value at a forced sale under the best of circumstances." Dkt. 107 at 23 (quoting *Holt*, 688 S.W.2d at 416).  But that is not the holding in *Holt*.  The holding is that where "a conscience shocking inadequate price" is the "only infirmity" alleged in an action to set aside a foreclosure, that "lone infirmity" is insufficient to void a foreclosure sale, which is an argument Aik Chuan has not made.  *Holt*, 688 S.W.2d at 416.

13

But even if AGF were to receive the benefit of the fair market presumption under Tennessee law (and it should not), AGF fails to address the substantial record evidence that AGF sold the Rockwood Plant for materially less than fair market value, facts that rebut any presumption in AGF's favor as detailed in Section I(C)(3) immediately below.  *See* Dkt. 99, CoL ¶¶ 270-81.

### 3. Under Either the UCC or Tennessee Real Property Law, the Foreclosure Sale Was Not Commercially Reasonable and Did Not Achieve Fair Market Value for the Plant

The undisputed facts are that: (i) Kolmar failed to market the Rockwood Plant to any interested and/or relevant third party apart from placing a "Foreclosure Notice and UCC Sale" post in the Roane County News, that only mentioned the coordinates of the plot of land and a vague reference to "any tangible personal property or fixtures" located on the property; and (ii) Kolmar sold the plant to itself for $1.7 million.  Dkt. 99, FoF ¶¶ 137-156.

Incredibly, Kolmar arrived at its $1.7 million "bid" by taking a one year old machinery and equipment appraisal that estimated certain (but not all) equipment at the Rockwood Plant as having a fair market value of $4,048,850,[11] attributing *literally zero* value to the over 80 acres of land that the plant sat on, subtracting an approximate $900,000 lien a Global Energy contractor filed on the property, and subtracting approximately $1.7 million in *anticipated legal costs for this lawsuit* (having nothing to do with costs incurred in the foreclosure sale itself).  Dkt. 99, FoF ¶ 149.  Such a methodology does not pass the straight face test as a proper way to calculate the fair market value of a renewable diesel plant.

---

[11] The company that created this appraisal in March 2020, Branford Group, admitted to a whole host of facts that demonstrate the inaccuracy and unreliability of its appraisal, including that it used a comparable sales approach by looking on websites such as eBay.com and Alibaba.com (known for selling counterfeit and low quality knockoff goods) to find similar parts to those used at the Rockwood Plant.  And Branford did so notwithstanding that the plant employed, in large part, custom equipment that is not sold off the shelf, and particularly not on the aforementioned websites.  Dkt. 99, FoF ¶¶ 150-156.

But without evaluating how AGF arrived at its $1.7 million bid, Kolmar's valuation expert, Mr. Van Vleet, nevertheless opines that $1.7 million is *precisely* the fair market value of the Rockwood Plant at the time of the Foreclosure Sale because it was allegedly the product of an arm's-length transaction.  But the undisputed facts demonstrate that it was not.  AGF directed the timing, manner, and method of the foreclosure sale, AGF controlled the Credit Line Deed of Trust Trustee who conducted the sale (AGF's attorney), AGF purchased the plant as the sole bidder, and Global Energy, which was divested of any independent corporate officers or directors, was under compulsion to sell the plant.  Dkt. 99, FoF ¶¶ 137-156.

The opinion of Kolmar's purported expert simply cannot be squared with Kolmar's own contemporaneous financial projections for the Rockwood Plant or comments made by Kolmar to its parent company's board.  Kolmar's financial models from June 2021 (about a month prior to the foreclosure sale) and August 2021 (about a month after the foreclosure sale[12]) project that the Rockwood Plant would achieve *hundreds of millions of dollars in EBITDA* over a 6-year period from 2021-2026.  Dkt. 99, FoF ¶¶ 111-113, 164.  And while Kolmar tries to characterize those projections now as "purely aspirational" (*see, e.g.*, Dkt. 107 at 24; Luddy Aff. ¶ 143), Kolmar's CFO, Kevin Luddy, confirmed under oath that Kolmar sent its August 2021 projections to Deutsche Bank, one of the largest financial institutions in the world, for the express purpose of seeking funding for the completion of the Rockwood Plant.  Dkt. 99, FoF ¶ 164.  Mr. Luddy also testified that Kolmar thought the projections were reasonable and achievable at the time and that they were also based on reasonable assumptions.  Dkt. 99, FoF ¶¶ 164-166.  Significantly, those projections also came on the heels of comments made by Raf Aviner, Kolmar Americas, Inc.'s President, at a Kolmar AG board meeting just before the foreclosure sale that he was "hopeful that

---

[12] Kolmar's CFO testified that these projections were made without a single improvement implemented at the Rockwood Plant since foreclosure.

Kolmar will fully own [the Rockwood] project, as the projected profitability is extraordinary and without debt burden attached to it."[13]  Def. Ex. 43 at AGFK_088748-49.

Equally probative is that, after the foreclosure sale, Kolmar poured new and significant capital expenditures ("CapEx") into the Rockwood Plant between 2022 and the present, including spending at least *27 million* on additional work aimed at commercializing the plant.  Dkt. 99, FoF ¶¶ 167.  It is simply not plausible that a sophisticated commodities trader like Kolmar would spend $27 million in CapEx to fix a plant that it truly believed was "unfixable" and/or nearly worthless. The truth is that Kolmar recognized the incredible financial upside that existed at the Rockwood Plant if, as its President and CFO believed at the time, the plant could be commercialized.  There was, of course, some executional risk involved in the project at the time of foreclosure, but that's true of many "high risk, high reward" entities that have significant market value.  Kolmar's suggestion today that the Rockwood Plant had little to no value at the time of foreclosure (or no more than $1.7 million) is revisionist history at its very worst.

### 4.    Kolmar's Arguments That the Rockwood Plant Was Not a "Going Concern" and Cannot Be Valued Based on Future Revenue Projections Are Contrary to Law and Wrong

For the same reasons discussed above, Kolmar's argument (and the related "opinion" of Kolmar's purported expert witness) that the "Rockwood site" was not a "going concern" at the time of the Foreclosure Sale falls flat as a factual matter.  Among other things, management around the same time was forecasting future revenue for many years to come and Kolmar ultimately invested more than $27 million in CapEx to try to commercialize the plant post-foreclosure.  Dkt. 99, FoF ¶ 167.  That is not what a business on the brink of bankruptcy or liquidation looks like and

---

[13] During that same board meeting, Mr. Aviner put forth a concrete plan that Kolmar intended to pursue which consisted of "foreclosure proceedings," as well as coordination between Kolmar "Technip and USP&E aiming at high quality joint consensus on the go-forward with the Rockwood upgrade on the way to 75% uptime."  Dkt. 99, FoF ¶ 113.

this case is not being litigated in Bankruptcy Court or under the Bankruptcy Code. But despite those undeniable realities, Kolmar nevertheless relies on inapposite bankruptcy liquidation cases to argue that the assets of insolvent businesses should be assigned liquidation values, not going concern values. Dkt. 107 at 23-24 (citing *In re Flagstaff Foodservice Corp.*, 56 B.R. 899 (Bankr. S.D.N.Y. 1986); *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51 (Bankr. S.D.N.Y. 1999)).

Those cases are inapplicable on their face because they analyze *specifically under certain bankruptcy code provisions* whether to assign going concern values or liquidation values to the assets of a debtor in bankruptcy. For instance, *Flagstaff* concerns "the rights of a seller who delivers goods to a buyer and then attempts to reclaim them after the buyer goes into bankruptcy." 56 B.R. 899 at 904. But even if the Court were to apply the bankruptcy-specific (and inapplicable) principles set forth in Kolmar's cases here, the Rockwood Plant would still qualify as a going concern.

Kolmar's bankruptcy cases explain that applying liquidation values is appropriate only when the debtor was "wholly inoperative" with an "inability to reorganize post-bankruptcy," *Adler* 247 B.R. at 111, and thus in a "liquidating posture." *Flagstaff*, 56 B.R. at 906. In contrast, going concern valuations should be applied where a "going concern" will "emerge from [the bankruptcy] proceedings." *Id.* The entire pre- and post-foreclosure record here makes it clear that the Rockwood Plant was not "wholly inoperative" or in a "liquidating posture" at the time of the Foreclosure Sale. In addition to the many facts set forth in Section I(C)(3) above, the following additional facts and authorities support that conclusion as well:

- Throughout spring 2021, Global Energy was seeking additional capital to *continue developing* the Rockwood Plant (which Kolmar blocked), Dkt. 99, FoF ¶¶ 95-105;

- In April 2021, Global Energy, Proton Power, and Kolmar had developed a joint plan intended to improve continuity of operation and understood the Plant's issues

to be fixable with these solutions, Dkt. 99, FoF ¶¶ 84-94; Def. Exs. 36; 338-339; 353; Smith Aff. ¶ 30;

- In May 4, 2021 correspondence to Aik Chuan, President of Kolmar Raf Aviner wrote that "the Rockwood Plant **will** be able to sustain itself well within the next 6 months by meeting the 75% operating objective," Def. Ex. 15; Dkt. 99, FoF ¶ 94;

- In a May 20, 2021 internal Kolmar email, Mr. Aviner stated "[o]ur overall objective is, and we are successfully moving in this direction, to take over the management of the project. The project continues to have the promise we always envisaged . . . ." Def. Ex. 20; FoF ¶ 109; and

- In April 2022, Kolmar continued to seek lender funding, including by sending Deutsche Bank an updated model projecting $1.4 billion in total EBITDA through 2052 that included the impact of adding a second production facility, Dkt. 99, FoF ¶ 165; Def. Ex. 67-68.

The record is clear that, far from "wholly inoperative" and in a "liquidating posture," at the time of the Foreclosure Sale (and ever since then) the Rockwood Plant was "expected to continue operating into the future, consistent with the assumption of a going concern premise of value." Brown Aff. ¶ 14.

Kolmar makes a related, but separate, argument that "a new enterprise with no track record of making any sales is not considered a going concern." Dkt. 107 at 24. In support of this proposition, Kolmar misconstrues two of this Court's opinions. *See id.* (citing *New Pacific Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, No. 99-cv-2436(DLC), 1999 WL 285493 (S.D.N.Y. May 6, 1999); *Lightbox Ventures, LLC v. 3rd Home Ltd.*, No. 16-cv-2379(DLC), 2017 WL 5312187 (S.D.N.Y Nov. 13, 2017)). Neither case stands for that proposition.

In *New Pacific*, the plaintiff, which had signed a contract to purchase certain manufacturing equipment, sought a preliminary injunction requiring specific performance of the contract. 1999 WL 285493, at *1. In attempting to establish irreparable harm, the plaintiff claimed that it had "suffered . . . and continues to suffer . . . lost good will." *Id.* at *7. This Court rejected that possibility because the plaintiff never produced any products, explaining that any good will would

be "prospective good will that could develop once the Equipment is up and running and the [products] are being sold on the market." *Id.*  Here, Aik Chuan is not seeking any damages based on a loss of good will so the case is not on-point at all.

Kolmar also misdescribes the holding in *Lightbox*.  There, according to Kolmar, this Court "rejected an expert report that valued a new enterprise as a going concern based on the projections of what the enterprise may one day earn if operational – despite no commissions ever being earned."  Dkt. 107 at 24 (citing *Lightbox*, 2017 WL 5312187, at *9-10.).  But Kolmar fails to provide the rationale behind the Court's decision, which was that the plaintiff had provided its experts its own first-year revenue and growth projections and specifically asked them "to rely and assume, without independent verification, that the data provided were accurate, reasonably prepared and reflected the best available estimates of the future financial results and condition'" of the joint venture at issue.  *Id.* at *10 n.13.  The Court also emphasized that there was no evidence in the record "to support either the projections or the $65 million figure" the plaintiff had provided to its experts.  *Id.* at *11.  This Court's decision also turned on "the number of unsupported assumptions at play" in the experts' analysis that were contrary to the record.  *Id.* at *10.

The contrast here could not be starker.  Aik Chuan's expert Marc Brown, in valuing the Rockwood Plant, does not utilize some "made for litigation purposes" and post-hoc projections that Aik Chuan alone calculated and directed its expert not to verify.  Instead, Mr. Brown's discounted cash flow analysis ("DCF") is based on party opponent ***Kolmar's own financial projections*** from the period surrounding the Foreclosure Sale.  Dkt. 99, FoF ¶ 169; Def. Ex. 40; Def. Ex. 64; Brown Aff. ¶¶ 14-16.  And whereas this Court in *Lightbox* found that there was no evidence in the record to support the revenue projections there, here Kolmar's detailed financial models themselves constitute ample documentary evidence supporting the projections that Aik

Chuan invokes.  Def. Ex. 40; Def. Ex. 64; Brown Aff. ¶¶ 14-16; *see also* Ex. 6-9 to Appendix A of Brown Aff. (elucidating bases of Kolmar's financial models as part of Brown's DCF analysis). These Kolmar projections were also described by Kolmar's CFO as reasonable at the time and Kolmar provided them to potential lenders such as Deutsche Bank.  Dkt. 99, FoF ¶ 164; Def. Ex. 63-66; Luddy Dep. at 37:17-24; *id.* at 31:7-32:1.

Kolmar's suggestion that a pre-revenue project cannot be treated as a going concern not only ignores how the $200+ *billion* U.S. domestic venture capital industry works (regularly placing significant value on early-stage and pre-revenue companies based on future potential),[14] but also how courts across the country have approached the valuation of pre-revenue entities factually analogous to the Rockwood Plant.  For example, *Nebraska Nutrients, Inc. v. Shepherd* concerned an agreement to build, own, and operate a plant "to manufacture ethanol and yeast products."  626 N.W.2d 472, 483 (Neb. 2001).  After "construction delays," the work on the plant stopped.  *Id.* at 490.  At that point, "the plant was approximately 95 percent complete but not yet operational." *Id.* at 483.  The parties' dispute centered on the value of certain equity interests in the plant.  *Id.* at 511.  One of the issues the Nebraska Supreme Court addressed was whether the "expert testimony on damages was speculative and therefore inadmissible" because "[t]here was insufficient factual basis to assume that the [ethanol] plant would ever have become operational at all because it utilized unproven 'short steep' technology which had never been employed on a commercial scale."  *Id.* at 508.

The court held that "where evidence is available to furnish a reasonabl[y] certain factual basis for computation of probable losses, recovery of lost profits cannot be denied, even though a

---

[14] Aswath Damodaran, *Valuing Young, Start-up and Growth Companies: Estimation Issues and Valuation Challenges* 2-5, 19, 37-43 (May 2009) (explaining how start-ups, even pre-revenue, can be valued using income-based approaches, including by using discount rates to account for the relevant risks), *available at* https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/younggrowth.pdf.

new business venture is involved." *Id.* at 508.  This was true even though "the plant would utilize [ ] novel technology," because witnesses at trial expressed confidence that the plant would ultimately "operate as designed." *Id.* at 508-09.

There was therefore "an adequate factual basis" for damages opinions based on "projections regarding the profitability of the plant if it had been completed" and utilizing "the pro forma financial and product yield projections for the plant" developed by one of the stakeholders in the plant.  *Id.* at 509-10.  Rejecting the argument that the projections were "the product of a by guess and by golly methodology," the court emphasized that "the pro forma projections were included in the application for funding submitted to [a potential lender] with the knowledge and approval" one of the stakeholders.  *Id.*

Here, Kolmar's post-foreclosure CapEx expenditures, detailed financial projections (similarly sent to financial institutions), and plant development plans presented to the Kolmar Board of Directors right before the Foreclosure Sale and ultimately approved all demonstrate Kolmar's belief at the time (without the benefit of hindsight) that the problems at the Rockwood Plant were fixable and that the plant would ultimately "operate as designed." *Nebraska Nutrients*, 626 N.W.2d at 508-09.  The prior owner of the plant, Global Energy, thought the same.  Smith Aff., ¶ 27-33.  It also bears emphasis that the although the plant in *Nebraska Nutrients* was, like the Rockwood Plant here, not yet commercialized, that plant, unlike Rockwood, relied on an "unproven technology." *Nebraska Nutrients*, 626 N.W.2d at 508.  As the evidence will establish at trial, multiple third parties confirmed, in different ways and at different times, that the core technology at Rockwood worked.  Dkt. 99, FoF  ¶¶ 22-25; Def. Exs. 524-526; 532-535; Smith Aff., ¶ 17; Hooi Aff., ¶ 10-12; Leow Aff., ¶ 14.

*Nebraska Nutrients* is also consistent with other cases that treat pre-revenue businesses and/or projects analogous to the Rockwood Plant as going concerns. *See also GLC-South Hillsboro, LLC, v. Washington County Assessor*, TC-MD 180141R, 2021 WL 2290314, *2, 10-11 (Or. T.C. June 4, 2021) (adopting expert's DCF valuation of undeveloped property because "market participants would use this approach," where property was to be developed into its "highest and best use" as a "large master-planned community" but "no master plan for actual developments had been approved," and where DCF model utilized projections of "future developable land sales" and "reasonable" estimates of the "sellout period" and quantities of "future [Transportation Development Tax] credits and reimbursements"); *Terrene Invs. v. C.I.R.*, 94 T.C.M. (CCH), 2007 WL 2254734, *5, 10-11 (T.C. 2007) (utilizing a DCF method to value a mine by "estimating the volume of recoverable sand and gravel, figuring out how long it would take an operator to mine it, finding a reasonable royalty rate and residual value, and then applying an appropriate discount rate to the resulting cashflow [to adjust for risks, including risk of business interruption]").

## II.     Kolmar Completely Mischaracterizes Aik Chuan's Tortious Interference Counterclaim

### A.     Kolmar Ignores that Aik Chuan's Tortious Interference Claim is Based on the Promissory Notes, Not Some "Prospective" Agreement Between Global and Some Third Party

With respect to Aik Chuan's tortious interference claims, Kolmar's Pretrial Memo presents nothing more than classic strawman arguments, mischaracterizing Aik Chuan's claim beyond all recognition and then attacking the validity of a claim that Aik Chuan has never asserted. Specifically, Kolmar argues that Aik Chuan's claim "is not that [Kolmar] tortiously interfered with some Aik Chuan contract but rather some prospective ones of Global, even though Global has never made such a claim." Dkt. 107 at 29-31.  That is not even close to an accurate description of Aik Chuan's claim and Kolmar should know that.  Aik Chuan is not asserting interference of some

unknown, prospective Global Energy contract, but of *Aik Chuan's* own contracts with *Global Energy* (*i.e.*, the Promissory Notes that were executed as part of the sale of the Rockwood Plant) wherein Global Energy agreed to pay a principal amount of $85 million plus interest to Aik Chuan, the interest of which began accruing on the date of the notes.[15]

This description is consistent with this Court's Order largely denying Kolmar's motion to dismiss and with Aik Chuan's pleadings. *See* Am. Counterclaims, Dkt. 28, ¶¶ 10, 160-169 (Count II); Aik Chuan's MTD Opp., Dkt. 46, at 23-27; Dkt. 62, at 12, 22-25. Indeed, even Kolmar has previously recognized, at least once, that Aik Chuan's tortious interference claim arises out of Kolmar's interference with the Promissory Notes. *See, e.g.*, AGF MTD, Dkt. 38, at 29. It follows that Kolmar's arguments regarding Global Energy's purported "prospective" contracts based on lay-witness testimony are not relevant to Aik Chuan's tortious interference counterclaims. As such, Kolmar has not asserted *any* legal defenses to Aik Chuan's tortious interference claim as actually pled (based on Kolmar's tortious interference with the Promissory Notes) other than the economic interest defense discussed immediately below.

### B. The Economic Interest Defense is Not Available to Kolmar as a Matter of Law and the Facts Do Not Support its Application to AGF

AGF alone—but not Kolmar—claims that the economic interest defense bars Aik Chuan's tortious interference claim (without reference to any specific contract) because as Hold Co.'s creditor, AGF "acted to protect its own financial interest in the Rockwood site[.]" Dkt. 107 at 30-31. This argument is entirely without merit.

*First*, Kolmar Americas, Inc. is not pursuing this defense for a good reason. Kolmar Americas, Inc. cannot avail itself of the economic interest defense because: (i) as the parent

---

[15] Global Energy has been in breach of its interest payment obligations under the Promissory Notes for more than two years now. Dkt. 99, CoL ¶¶ 309-316.

company of AGF, Kolmar Americas, Inc. has no stake or interest in the relevant agreements or in protecting and secured interest Global Energy had in or related to the Rockwood Property; and (ii) AGF itself limits the application of the defense to AGF's purported "financial interest" as Hold Co.'s Creditor, which Kolmar is not. *See* Dkt. 107 at 30-31.

*Second*, although the economic defense has been applied to claims for tortious interference "where defendant was the breaching party's creditor," *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (N.Y. 2007), "the economic interest defense is ***only*** properly applied where the defendant takes action to protect the legitimate business interests of *the breaching party* in which the defendant holds an economic stake." *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, No. 16-cv-2767(GBD), 2019 WL 1649983, at *16 (S.D.N.Y. Mar. 28, 2019) (second alteration in original). Here, AGF readily concedes that it acted "in its own financial interest," and not in Hold Co.'s business. Dkt. 107 at 30-31.

Without citing any caselaw, AGF claims that it its conduct was "indisputably protected under the economic interest defense" because it enforced its "remedies available . . . under the Loan Agreement to ***protect its investment*** in the Rockwood" Property, "which was failing under Global's leadership[.]" *Id.* But AGF's conduct was indisputably not "aligned with" Global Energy's business. *Hudson Bay*, 2019 WL 1649983, at *16. Instead, AGF was "motivated by malice or employed illegal means to safeguard its interest" because it ***pursued*** fictious Events of Defaults under the Loan Agreement and thereby ***caused*** Global Energy to breach the Promissory Notes. *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 482 (E.D.N.Y. 2012) (citation omitted); *EPAC Techs. Ltd. V. Interforum S.A.*, 193 N.Y.S.3d 3, 5 (1st Dep't 2023) (holding that a defendant may be liable for tortious interference even where the economic interest defense would otherwise apply if the defendant acted with malice); *Bausch &*

*Lomb Inc. v. Mimetogen Pharms., Inc.*, No. 14-cv-6640(FPG), 2016 WL 2622013, at *12 (W.D.N.Y. May 5, 2016) (same).  Indeed, as this Court previously recognized, had AGF and Kolmar "been interested in preserving their economic interest, they would not have induced [Global Energy] to default on the" Loan Agreement.  *See* Dkt. 62 at 25.  But that is exactly what the evidence at trial will prove happened here and, as a result, AGF cannot shield itself from tortious interference liability based on the economic interest defense.  *Id.*

## CONCLUSION

For the foregoing reasons, Aik Chuan respectfully requests that the Court find in Aik Chuan's favor by finding Kolmar liable on Aik Chuan's counterclaims of: (1) breach of the Subordination Agreement and the duty of good faith and fair dealing by improperly claiming events of default and seeking outstanding indebtedness from Aik Chuan; (2) breach of the subordination agreement and the duty of good faith and fair dealing by improperly foreclosing on the Rockwood Plant, purchasing it for less than fair market value and through commercially unreasonable means; and (3) tortious interference with Global Energy's Promissory Notes to Aik Chuan, and finding that Aik Chuan is not liable for Kolmar's claim that Aik Chuan breached the subordination agreement.

* * *

Dated: October 27, 2023
Chicago, Illinois

Respectfully submitted,

/s/ *John F. Hagan, Jr.*
John F. Hagan, Jr., *pro hac vice*
Mark J. Samartino, *pro hac vice*
Cameron J. Davis, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Tel.:  (312) 583-2300
Fax:  (312) 583-2370
john.hagan@arnoldporter.com

mark.samartino@arnoldporter.com
cameron.davis@arnoldporter.com

Melissa A. Brown
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Tel.: (212) 836-8000
Fax: (212) 836-8689
melissa.brown@arnoldporter.com

*Attorneys for Defendant/Counterclaim Plaintiff Aik Chuan Construction Pte. Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 27, 2023, a true and correct copy of the foregoing was served to the parties' counsel of record via ECF.


_/s/ John F. Hagan, Jr._
John F. Hagan, Jr