UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
AMERICAN GREENFUELS ROCKWOOD           :
(TENNESSEE), LLC,                      :
                                       :
                    Plaintiff,         :
                                       :
           -v-                         :
                                       :
AIK CHUAN CONSTRUCTION PTE. LTD.,      :
                                       :
                    Defendant.         :
                                       :          21cv7680 (DLC)
  ------------------------------------:
                                       :          OPINION AND ORDER
AIK CHUAN CONSTRUCTION PTE. LTD.,      :
                                       :
           Counterclaim Plaintiff,     :
                                       :
           -v-                         :
                                       :
KOLMAR AMERICAS, INC. and AMERICAN     :
GREENFUELS ROCKWOOD (TENNESSEE), LLC,  :
                                       :
           Counterclaim Defendants.    :
                                       :
-------------------------------------- X

APPEARANCES:

For Plaintiff and Counterclaim Defendants:
John N. Thomas
Jenna Christine Hutchinson
Troutman Pepper Hamilton Sanders LLP
875 Third Avenue
New York, NY 10022

Leslie A. Davis
Jenna Noelle Tyrpak
Margaret Burnside
Troutman Pepper Hamilton Sanders LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004

Sheila Zifu Chen

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614

For Defendant and Counterclaim Plaintiff:
John F. Hagan, Jr.
Mark J. Samartino
Cameron Davis
Arnold & Porter Kay Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602

Melissa A. Brown
Arnold & Porter Kay Scholer LLP
250 West 55th Street
New York, NY 10019

DENISE COTE, District Judge:

This action arises out of a failed project to develop a renewable diesel energy plant in Rockwood, Tennessee.  Nonparty Global Energy purchased the partially constructed plant from the defendant Aik Chuan Construction Pte. Ltd. ("Aik Chuan") in March 2020.  Global Energy simultaneously obtained a bridge loan from the plaintiff American GreenFuels Rockwood (Tennessee), LLC ("GreenFuels").  The bridge loan was intended to provide Global Energy with enough funding to complete the initial validation phase of the manufacturing process while Global Energy worked to find an investor to fund the construction of the remainder of the plant.  Global Energy had issued promissory notes to Aik Chuan to purchase the plant and Aik Chuan agreed to subordinate some of that debt to the GreenFuels bridge loan and to assume Global Energy's obligations to GreenFuels in the event Global

Energy defaulted on the bridge loan.  Global Energy defaulted in May 2021 and Aik Chuan declined to assume the GreenFuels' bridge loan.  In July 2021, GreenFuels bought the plant at a foreclosure sale.

In this action, GreenFuels brings a claim against Aik Chuan for breach of the subordination agreement for failing to pay the outstanding amount due on the bridge loan following the foreclosure sale.  Aik Chuan has brought counterclaims against GreenFuels and its parent company, Kolmar Americas, Inc. ("Kolmar"), alleging that the counterclaim defendants deliberately induced a default and also conducted a commercially unreasonable foreclosure sale.[1]

This Opinion contains the Court's findings of fact and conclusions of law following a bench trial held between November 13 and November 16, 2023.  For the following reasons, judgment is granted to GreenFuels on its breach of contract claim and to the counterclaim defendants on Aik Chuan's counterclaims.

---

[1] Kolmar created GreenFuels, a limited liability company whose sole member is Kolmar, to act as the lender for the bridge loan. The names "GreenFuels" and "Kolmar" are used interchangeably, unless otherwise noted.

## Findings of Fact[2]

Aik Chuan is a Singapore company that operates in a diverse set of industries ranging from music to hospitality to construction.  Through its involvement in a horse racing club, it became interested in the conversion of biomass to electricity.  Through its investigation of that technology, it discovered Proton Power Inc. ("Proton Power"), a Tennessee company.  In 2014, Aik Chuan entered into an agreement with Proton Power for the buildout of ten renewable diesel plants, the first one of which was located in Rockwood, Tennessee (the "Rockwood Plant" or "Site").  Proton Power had developed a technology to create diesel fuel through burning wood chips in a process known as pyrolysis.  The process used a Cellulose to Hydrogen Power or "CHyP" reactor.

The Rockwood Plant was designed to consist of "modules," with each module containing eight CHyP reactors.  The buildout of the Rockwood Plant initially focused on Module 1, which was intended for testing purposes only.  It was anticipated that the Rockwood Plant would ultimately consist of six or more commercial modules producing renewable diesel.

Proton Power encountered difficulties with the fuel conversion process and in particular the downstream process of

---

[2] The Court's findings of fact are primarily contained in this section but appear as well in the conclusions of law.

extracting the diesel fuel from the other byproducts created in the pyrolysis process.  Although Aik Chuan invested over $60 million in the venture over the course of six years, Proton Power failed to deliver a working diesel plant and Aik Chuan decided to sell the Rockwood Plant.  At the time of the sale, Proton Power had only constructed Module 1.

I.   The March 2020 Transaction

On March 30, 2020, Aik Chuan sold the Rockwood Plant to Global Energy Hold Co., LLC ("GE Hold") for two promissory notes, a warrant, and an upfront payment of $250,000.  An indirect subsidiary of GE Hold is Global Energy Rockwood, LLC ("GE Rockwood"), which is the company that operated the Rockwood Plant after it was purchased from Aik Chuan.  For ease of reference, the Court refers collectively to all the Global entities as "Global Energy."[3]

At the time of the sale, Module 1 had produced some gas that could be converted to renewable diesel, but the diesel separation system had not been fully constructed and could not handle a continuous flow from the reactors.  Global Energy knew it needed to complete construction of Module 2, which was

---

[3] GE Hold is part of a larger corporate family in which Global Energy, LLC ("GE Parent") owns GE Hold, GE Hold owns Global Energy Pledge Co. ("GE Pledge"), GE Pledge owns Global Energy Rockwood Borrower Co., LLC ("GE Borrower"), and GE Borrower owns GE Rockwood.  These entities were formed to purchase the Rockwood Plant.

intended to produce renewable diesel for sale, and to validate the commercial viability of the conversion process.  With that validation in hand, it hoped to procure a partner to finance the construction of the complete Rockwood Plant.  Therefore, with its purchase of the Rockwood Plant, Global Energy looked for an entity to finance Global Energy's completion of the construction and the commercial validation of Module 2.  That entity was plaintiff GreenFuels.

GreenFuels is a subsidiary of Kolmar.  Kolmar and its affiliates purchase and market petrochemicals, petroleum and gas products, biodiesel, and other renewable fuels around the world. Kolmar has subsidiary operations that are involved in trading and manufacturing these fuels.  As part of its traditional business activities, Kolmar had entered into a contract with Global Energy to buy all of Global Energy's production of renewable diesel at the Rockwood Plant in the event that the site became commercially operational.  This is referred to as an offtake agreement.

Kolmar's subsidiary GreenFuels was created to extend a bridge loan to Global Energy.  This bridge loan was to be used by Global Energy to complete the construction of Module 2 and to verify the commercialization of the manufacturing process.

Thus, the three parties just mentioned -- Aik Chuan, Global Energy, and GreenFuels -- had interlocking interests. Aik Chuan hoped that the Rockwood Plant would succeed so that Global Energy would be able to pay off the promissory notes it had issued to Aik Chuan. Global Energy needed to complete construction on Module 2 to demonstrate the commercial viability of the technology, and it obtained financing from GreenFuels to support that construction. To support GreenFuels' loan to Global Energy, Aik Chuan agreed to subordinate one of the promissory notes Global Energy had issued to it and agreed as well to assume Global Energy's debt to GreenFuels in the event of a default. These interlocking agreements are described next.

A.   The Promissory Notes

Aik Chuan sold the Rockwood Plant to Global Energy in exchange for two promissory notes, which together were worth approximately $85 million (the "Promissory Notes"), as well as a warrant for Aik Chuan to purchase a 5% interest in GE Hold and a payment of $250,000 at closing. The Promissory Notes are governed by New York law and consist of one promissory note dated March 25, 2020 for a principal amount of $40,480,930.06 and a second promissory note dated March 27, 2020 for a principal amount of $44,519,070.

The Promissory Notes have a maturity date of "the earlier of: (1) the date which is fifty-five (55) months following the date of this Note, and (2) the date that [Global Energy] . . . refinances all of its debt obligations" under a "Balance of Plant Loan Agreement." The "Balance of Plant Loan Agreement" means a "loan agreement to be entered into by [Global Energy] to finance the balance of plant construction, which loan it intends to incur promptly following the successful completion of performance tests [on Module 2]." Aik Chuan therefore maintained a significant financial interest in the success of the Rockwood Plant by virtue of its equity warrant rights and the Promissory Notes.

    B.   The Loan Agreement

    On March 30, Global Energy also entered into a loan agreement with GreenFuels as lender (the "Loan Agreement"). The Loan Agreement is also governed by New York law. Under the Loan Agreement, GreenFuels agreed to extend a loan to Global Energy in the principal amount of $7.95 million, with 170% of the outstanding principal due at maturity (the "GreenFuels Loan"). The GreenFuels Loan also included a base interest rate of 12% per annum, and "upon the occurrence of any Event of Default and for so long as it is continuing" was subject to a default interest rate of 25% on the "the outstanding principal amount."

8

The GreenFuels Loan was to be used to fund the construction and operation of Module 2.  The Loan Agreement provided that the loan was to be used solely:

> (i) in an aggregate amount not to exceed $250,000 towards financing the Acquisition, (ii) to fund the Account, which funds shall subsequently be applied to pay solely the Project Costs in accordance with the Project Schedule and the Project Budget and (iii) to pay transaction costs and expenses incurred in connection with the consummation of the transactions contemplated by the Operative Documents on the Closing Date.

The "Acquisition" refers to Global Energy's purchase of the Rockwood Plant from Aik Chuan.  "Project" is defined as "the ownership, construction and operation of Module II" at the Rockwood Plant.

The Loan Agreement contains two provisions of particular significance to this dispute:  Global Energy's duties (a) to maintain liquidity of at least $50,000 and (b) to succeed by May 31, 2021, in verifying that the performance of Module 2 had met identified operating standards.  Article 8, the "Events of Default," provides that:

> The occurrence of any of the following events shall constitute an event of default (individually, an "Event of Default", and collectively, "Events of Default") hereunder: . . .
>
> > 8.7 Breach of Terms of Agreement. (a) Borrower shall fail to perform or observe any of the covenants set forth in . . . Article 6 . . .

8.8 Verification.   The Verification Date shall
not have occurred on or prior to the Target
Verification Date.

Article 6.26 provides that Global Energy will not, without the

prior written consent of GreenFuels, "permit Liquidity at any

time to be less than $50,000" (the "Liquidity Provision").

The Loan Agreement defines the requirements and terms

related to the verification provision in Article 8 (the

"Verification Provision"), as follows:

- "Verification Date" means "the date upon which
  Verification has occurred, as determined by [GreenFuels],
  in consultation with the ESA Contractor and/or SSA
  Contractor, pursuant to a written notice delivered to
  [Global Energy] immediately following the completion of
  the successful Verification Test."

- "Verification" means "that Module II has successfully met
  the Verification Testing Criteria set forth on Exhibit B
  of [the Loan] Agreement."

- Exhibit B provides that "Module II will be deemed fully
  meeting lender requirements when such module operates and
  delivers 75% of Design Capacity . . . when operated in
  Standard Operating Mode . . . for any consecutive thirty
  (30) day period.  The testing of the Module II will be
  performed by parties selected by Borrower, in
  consultation with Lender."

- "Design Capacity" is defined in Exhibit B as the
  production of 87,120 gallons of renewable diesel fuel in
  30 days.

- "Standard Operating Mode" is defined in Exhibit B as
  "continuous, 24/7, operation whereby all CHyP Units are
  operating at all times."

(emphasis added).

Pursuant to Article 1.1 of the Loan Agreement, the Target Verification Date was May 31, 2020.  The Parties agree that the year is a typographical error, and the actual Target Verification Date was May 31, 2021.

The Loan Agreement has a maturity date of "the earlier to occur of (a) the date that is the eighteen (18) month anniversary of the Closing Date, (b) such earlier date on which the entire outstanding principal balance of the Loans, together with all unpaid interest, fees, charges and costs, become due and payable under the Agreement, and (c) the date Borrower enters into a Qualified Financing" for the completion of the Rockwood Plant.  Pursuant to Article 2.2,

> the obligation to pay, satisfy, perform and otherwise discharge all other Obligations, as and when they become due, are the joint and several obligations of [Global Energy] Parent and Borrower Co., and Lender shall have the right at any time to look to either [Global Energy] Parent or Borrower Co., or both of them, or to the Collateral pledged by them and the other Credit Parties, as it may determine in its sole discretion, for satisfaction of those obligations.

(emphasis added).  "Collateral" means "all real and personal property and intangibles, and proceeds of each of the foregoing, that is owned from time to time by any Credit Party."

Article 9 provides that upon the occurrence of an Event of Default under the Loan Agreement, GreenFuels "may, without

further notice of default . . . exercise any or all of the following rights and remedies, in any combination or order that Lender may elect" including "9.3 Acceleration" and "9.6 Remedies Under Financing Documents."  Article 9.3, "Acceleration," allows GreenFuels to:

> <u>Declare and make all sums of accrued and outstanding principal</u> (and the Repayment Amount payable with respect thereto) <u>and accrued but unpaid interest</u> remaining under this Agreement, together with all unpaid fees, any applicable prepayment premium, costs, charges and other amounts due hereunder or under any other Financing Document, <u>immediately due and payable</u>, provided that in the event of an Event of Default occurring under Section 8.4, all such amounts shall become immediately due and payable without further act of Lender or any other Person.

(emphasis added).

The remedies upon a default included the right to foreclose on the "Collateral."  Article 9.6, "Remedies Under Financing Documents," allows GreenFuels to:

> Without being limited by any of the foregoing, <u>exercise any and all rights and remedies available</u> to it under any of the Financing Documents, <u>including judicial or non-judicial foreclosure</u> or public or private sale <u>of any of the Collateral</u> . . . .

(emphasis added).

In addition, Article 11 of the Loan Agreement contains a waiver provision.  It provides that the lender's rights are not waived by, among other things, a delay in enforcing those rights.  It states, in part:

> <u>No</u> failure or <u>delay by Lender in exercising any right</u> or power hereunder or under any other Financing Document <u>shall operate as a waiver</u> thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

(emphasis added).

    C.    The Security Agreement and the Deed of Trust

At the time it executed the Loan Agreement, Global Energy executed with GreenFuels (as lender) a Pledge and Security Agreement (the "Security Agreement") and GE Rockwood executed with GreenFuels (as beneficiary) a Credit Line Deed of Trust (the "Deed of Trust"). The Security Agreement secured as collateral the personal property at the Rockwood Plant, including the equipment and technology, pursuant to Articles 8 and 9 of the Uniform Commercial Code ("UCC"). The Deed of Trust secured the real and tangible property at the Rockwood Plant as collateral for the GreenFuels Loan. Both contracts contain a New York choice of law provision.

Section 9.3 of the Security Agreement permitted GreenFuels, upon an Event of Default under the Loan Agreement, to conduct a sale of the personal property at the Rockwood Plant "to the extent permitted by applicable Law . . . which sale may be conducted by an employee or representative of [GreenFuels], and any such sale shall be considered or deemed to be a sale made in

a commercially reasonable manner."  It further provided that
"[i]n the event Lender shall bid at any foreclosure or trustee's
sale or at any private sale permitted by Law, this Agreement or
any other Financing Document, Lender may bid all or less than
the amount of the Secured Obligations."  The proceeds of any
foreclosure sale were required to be applied against any
Outstanding Indebtedness under the Loan Agreement.  The Security
Agreement also contained a waiver provision, whereby Global
Energy waived "all rights and remedies of a debtor or grantor
under the UCC or other applicable Law, and all formalities
prescribed by Law relative to the sale or disposition of the
Collateral."

The Deed of Trust irrevocably grants in trust, for the
benefit of GreenFuels:

> ALL of Trustor's right, title and interest <u>in the Land</u>
> . . .
>
> <u>TOGETHER WITH</u> all estate, right, title and interest of
> Trustor in and to <u>all such tangible property</u> now owned
> or hereafter acquired by Trustor (including all
> machinery, apparatus, equipment, materials, supplies,
> fittings and articles of personal property) and now or
> hereafter located on or at or attached to, or used in
> connection with the Real Estate <u>or any of the
> Improvements that are or are to become fixtures</u>.

(emphasis added).  The Deed of Trust provides that, in an Event
of Default under the Loan Agreement, GreenFuels may "enter into
and take possession of the Deed of Trust Estate" and "cause the

14

Trustee to sell the Deed of Trust Estate."  The Trustee was given the power "to sell Deed of Trust Estate and property subject hereto in accordance with the laws of the State of Tennessee."

D.   The Subordination Agreement

Finally, pursuant to a subordination agreement between Aik Chuan, GE Hold, and GreenFuels (the "Subordination Agreement"), Aik Chuan agreed to subordinate one of the Promissory Notes to the GreenFuels Loan and to assume Global Energy's obligations to repay GreenFuels in the event of a default.  The Subordination Agreement is also governed by the law of the State of New York.

Section 8.2 of the Subordination Agreement describes the requirement that GreenFuels provide a notice of default to Aik Chuan.  It provides that:

> if an Event of Default occurs . . . under any of the Financing Documents (as defined in the Loan Agreement) which Lender is not willing to waive, Lender shall promptly provide the Subordinated Creditor [Aik Chuan] with written notice thereof . . . which . . . shall include an accounting of the outstanding amount of the indebtedness under the Financing Documents as of such date (the "Outstanding Indebtedness").  Lender agrees that it shall not exercise any of its rights or remedies . . . in connection with such Event of Default without first providing not fewer than five (5) Business Days' notice to [Aik Chuan] ("Remedies Notice").

(emphasis added).

Upon issuance of the Remedies Notice, Aik Chuan was required to assume Global Energy's financial obligations to GreenFuels as set forth in the Financing Documents.  Section 8.2 provides that:

> Immediately upon Lender's issuance of the Remedies Notice, <u>the Subordinated Creditor [Aik Chuan] will assume</u>, and agrees it is obligated to assume, <u>the Financing Documents</u> from the Lender, and Lender agrees it will assign the Financing Documents to [Aik Chuan] in exchange for cash consideration in the amount of the Outstanding Indebtedness.

(emphasis added).  "Financing Documents" include, <u>inter alia</u>, the Loan Agreement, the Deed of Trust, and the Security Agreement.  Thus, upon an Event of Default and the receipt of a Remedies Notice, Aik Chuan was required to assume Global Energy's duty to pay GreenFuels the amounts owed under Article 9.3 of the Loan Agreement.

Before the execution of the Subordination Agreement, Global Energy's CEO Greg Smith emailed Aik Chuan to emphasize the significance of Section 8.2.  Smith explained: "Essentially, If Global Energy defaults during the Trial Phase construction, Aik Chuan will pay off the Trial Phase lender and become Senior secured over all of the Rockwood Assets."  Singapore Counsel for Aik Chuan responded that Aik Chuan was "fine with the proposed amendments."  Aik Chuan understood that, in the event of a

16

default by Global Energy, Aik Chuan had to pay GreenFuels
whatever it was owed under the Loan Agreement.

In the Subordination Agreement, Aik Chuan also waived its
right to assert certain claims and defenses.  It provides:

> the Subordinated Creditor [Aik Chuan], for itself and
> its parent, subsidiaries, affiliated related companies
> . . . hereby releases and waives, and agrees and
> covenants that it will not . . . directly or
> indirectly assert, commence or make any allegation . .
> . in Law or in equity . . . based on, arising out of
> relating to equitable subordination, breach of
> fiduciary duty, conflict of interest, affiliated or
> related party transaction, lender liability,
> unfairness, unclean hands or similar matter in
> relation to the Loans or any payment.

(emphasis added).

II.  Global Energy's Operation of the Rockwood Plant

Following its purchase of the Rockwood Plant, Global Energy
focused its efforts on the construction of Module 2.  It
retained USP&E, a third-party contractor, to help operate and
maintain the Rockwood Plant.  Within months, Global Energy
required additional capital in order to commercialize Module 2
and GreenFuels agreed to provide it.  The Loan Agreement and the
Subordination Agreement were amended to reflect additional loans
that GreenFuels extended to Global Energy on November 20, 2020;
March 1, 2021; and April 21, 2021.  Ultimately, GreenFuels
provided over $10 million to Global Energy through this bridge
loan.

17

Global Energy initially targeted the fall of 2020 for the 30-day Verification Test to occur.  Global Energy did not meet this goal.  Indeed, the construction of Module 2 was not even completed until the end of the year.  Following the module's construction, Global Energy encountered more serious problems and delays.  Although the reactors appeared to work, it was unclear whether any sizeable quantity of renewable diesel fuel could be produced through Module 2, much less whether the Rockwood Plant could be made commercially viable.

One of the problems related to the software used to control Module 2's operations.  The software that had been used to run Module 1 could not be used to run Module 2.  If the software did not work, Module 2 had to be run in "manual mode."  But in manual mode, the machinery and process could not operate on a continuous 24/7 basis, as required for Verification.

There were also problems with the mechanical system for feeding the wood supply into the reactors, or infeed system, and with the corkscrew-like augers used to push material through the system.  Any time these parts broke or failed there was more "downtime."  It was also dangerous to operate the Rockwood Plant because, due to a host of defects, oxygen would leak into the system and create an unacceptable risk of explosion.

18

The most challenging problem with Module 2, however, was tarring.  Tar was produced from the CHyP reactors as part of the pyrolysis process and would build up in the pipes and gears. The build-up restricted the flow of the diesel and other byproducts through the module.  The reactors needed to be shut down in order to clean away the tar.  The time the module was shut down for cleaning or repairs reduced the amount of "uptime"[4] and thus the amount of diesel the module was able to produce. As a result of these and other problems, attempts to run Module 2 continuously during the spring of 2021 failed.

Several of the problems with Module 2 required the use of spare or replacement parts.  USP&E used parts from Module 1 as replacement parts.  As a result, Module 1 was dismantled and used only for the harvesting of parts.  Not all of the Module 1 replacement components, however, were compatible with Module 2 and this resulted in additional delays.

On April 13 and 14, 2021, Kolmar's David Astrauckas met with Greg Smith of Global Energy and a representative of Proton Power at the Rockwood Plant (the "April 2021 Meeting").  This was the first visit by Astrauckas to the Plant since the start of the pandemic.  Before this time, Kolmar had depended largely

---

[4] Under the Verification Testing Criteria, the Rockwood Plant had an operating rate objective of 75%.

on Smith for reports about the Plant's operations and problems.
During the spring of 2021, Module 2 had been operating, on
average, less than 10% of the time.

At the April 2021 Meeting, Astrauckas sought to understand
the key issues and to see how Kolmar could support Global Energy
in completing the project.  The parties discussed the tarring
issue and other problems.  The parties also discussed a
workaround for the tarring issue through the creation of a
network of parallel piping.  Proton Power agreed to build and
install the new piping.  The additional piping was intended to
allow the flow of material through the module to be diverted
while the main piping was closed off and cleaned.  Once cleaned,
the main piping within Module 2 would be reopened.  Global
Energy hoped and expected that this solution would enable Module
2 to run continuously.  No one, however, expected that this
solution could be put in place within a matter of a few weeks.
Smith hoped that the installation would be completed by mid-June
2021.  At no time during the April 2021 Meeting did the parties
discuss changing the terms of the Loan Agreement or the
Verification Date.

Thus, due to myriad delays and difficulties, Module 2 was
not ready to operate continuously by the beginning of May 2021
and the Verification Test required by the Loan Agreement could

not commence.  The Verification Test is a 30-day test that would have to be initiated no later than May 1 in order to conclude by the Target Verification Date of May 31, 2021.  It is undisputed that the Rockwood Plant could not have achieved Verification by the Verification Date as the manufacturing problems prevented it from running continuously (or safely), much less from operating and delivering "75% of Design Capacity," as required by the Loan Agreement.

Nor did Global Energy have the money it needed to fix these problems.  As of May 2021, Global Energy had run out of money. During May, the USP&E workforce walked of the job because it was not being paid.  Module 2 did not operate after the workforce left the site because there was insufficient staff to conduct operations.  Additional funding was also needed to buy the piping and other equipment necessary for the Plant, as well as the woodchips or feedstock that would be fed into the module.

By early May 2021, Kolmar had concluded several things. Kolmar still believed in the technology and wanted the Rockwood Plant to succeed; it still hoped to benefit from its offtake agreement.  It also knew that Module 2 was at an "anemic" rate of production and that Global Energy required additional working capital to achieve commercialization.  Kolmar, however, did not want to invest any more money into that effort and wanted its

bridge loan repaid.  Kolmar had also lost confidence in Global
Energy and believed that the Plant needed more professional
management if it were to succeed.  Kolmar considered two courses
of action.  It decided to declare a default, require Aik Chuan
to assume the Loan Agreement debt and repay the bridge loan.  If
Aik Chuan refused to do so, GreenFuels would enforce its rights
under the Financing Documents, proceed to foreclosure, and if it
purchased the Rockwood Plant in the foreclosure, bring in more
professional management.  It was confident that it could procure
financing to complete the expansion of the Plant if it could
demonstrate the commercial viability of the manufacturing
process.  It projected the profitability of the Plant as
extraordinary if the technology and manufacturing process
actually worked.

On May 4, Kolmar informed Aik Chuan and Global Energy of
its plan to declare a default and require Aik Chuan to pay off
the GreenFuels Loan.  It proposed, however, that Aik Chuan fund
Global Energy's current capital requirements, which it estimated
to be $3.5 million.  If Aik Chuan were willing to do so, Kolmar
said it would "work with you to determine how long we will defer
the Notice of Default for."  Aik Chuan did not respond to this
letter.

Meanwhile, knowing that it needed more money to continue its work at the Rockwood Plant, on May 5 or 6, Global Energy filed a claim under its Professional Liability and Pollution Incident Liability insurance policy. The claim form reported that "design issues prevent the system from operating on a continuous basis." The claim identified six operational issues and proposed potential solutions that Global Energy estimated would cost between $3.43 million and $3.78 million to implement. The claim was denied.

Having had no response to its May 4 letter, on June 2, Kolmar sent Aik Chuan another letter proposing "a restructuring plan that is an alternative to foreclosure on the Rockwood assets." This letter proposed that Aik Chuan provide Global Energy with $5 million by August 1, 2021. Kolmar requested a response within 24 hours. This deadline was extended to June 4. Executives from Kolmar and Aik Chuan exchanged WhatsApp messages during this period, and Kolmar expressed its desire to collaborate with Aik Chuan on a restructuring of the Global Energy debt. It also offered to take over the management of the project to ensure that Module 2 was completed and validated. It hoped that its proposal would give both Kolmar and Aik Chuan the best chance to recoup their investments.

Aik Chuan did not respond with favor to any of Kolmar's proposals or make a counterproposal.  It did not want to invest any more money in the project, having already invested tens of millions of dollars with no return in sight.  It was well informed about the problems at the Plant since it had an employee on site during this entire period of time.

III. Notice of Default

On June 3, 2021, GreenFuels sent a "Notice of Events of Default under the Loan Agreement" to Global Energy.  The Notice identified two Events of Default, one of which was the failure to conclude the Verification Test.  It advised Global Energy that it would proceed to foreclosure.

The Notice stated, in relevant part:

This letter is notice to Global that as of June 1, 2021, Global has committed at least two Events of Default under the Loan Agreement.

First, an Event of Default occurred under Section 8.7 of the Loan Agreement.  Global breached Section 6.26 of the Loan Agreement when it broke its negative covenant to prohibit the balance in the Account to decrease below $50,000. . . .

Second, an Event of Default occurred under Section 8.8 of the Loan Agreement.  The Verification Date did not occur prior to the Target Verification Date.  This [sic] is no cure for this breach.

[GreenFuels] will now pursue any and all of the remedies available to it under the Loan Agreement . . . including non-judicial foreclosure and sale of the Collateral.

24

Also on June 3, GreenFuels sent notice to Aik Chuan of the
Events of Default in a "Loan Documents Default Notice as
required by the Subordination Agreement" (the "Default Notice").
GreenFuels cited Global Energy's failure to maintain a minimum
bank account balance of $50,000 and Global Energy's failure to
meet the Target Verification Date (together, the "Events of
Default").  The Default Notice stated that the "Outstanding
Indebtedness as of the date of this Loan Documents Default
Notice is US $19,014,303.00."  GreenFuels sent a second letter
to Aik Chuan on June 3 (the "Remedies Notice"), stating it would
"pursue and exercise any and all of the remedies available to it
under the Loan Agreement . . . against [Aik Chuan] and [Global
Energy] following the fifth Business Day from the date of this
Remedies Notice."  On June 4, Global Energy replied to Kolmar's
"Notice of Events of Default under the Loan Agreement" to remind
Kolmar that it could not initiate foreclosure proceedings "if
Aik Chuan assumes the financing documents."

Aik Chuan was advised by its corporate counsel and by
Global Energy that it was obligated to assume the GreenFuels
Loan or foreclosure would occur.  On June 7, Aik Chuan's
corporate counsel, who is based in Singapore and who had
negotiated the Subordination Agreement, told Aik Chuan:

> I have reviewed the relevant Subordination Agreement.
> Under clause 8.2, Aik Chuan must (it is not an option,

but an obligation) assume the indebtedness under the
loan documents if the lender issues the Remedies
Notice to Aik Chuan. . . .

(emphasis in original).  None of the exchanges by Global Energy,
Aik Chuan, or their counsel, dispute that an Event of Default
had occurred or that Aik Chuan had any option but to assume
Global Energy's obligations under the Financing Documents.  They
do discuss, however, how to slow down the pace of events.
Global Energy advised Aik Chuan: "if Aik Chuan signs the
assignment and assumption agreement all actions stop which may
buy us more time."

On June 10, Kolmar Group AG, which owns Kolmar, held a
board meeting.  The CEO of Kolmar outlined Kolmar's plan for the
Rockwood Plant.  He noted that the "easiest" route was to reach
a debt restructuring deal with Aik Chuan, but that Aik Chuan had
"not shown any constructive reaction to this proposal."  The
alternative plan was to achieve financial restructuring through
a foreclosure sale.  The foreclosure sale would either result in
a full repayment to Kolmar of the amount owed under the Loan
Agreement (if a third party bid above the Outstanding
Indebtedness) or in Kolmar's ownership of the Rockwood Plant.

Also on June 10, Aik Chuan responded to the Default Notice.
It explained that the Default Notice was not valid since it did
not include "a detailed accounting of the Outstanding

Indebtedness."  On June 11, GreenFuels provided a more detailed calculation of the Outstanding Indebtedness amount.  In none of the many messages that executives of Aik Chuan and Kolmar exchanged over WhatsApp or by telephone during this period did Aik Chuan ever disagree that an Event of Default had occurred.

Also on June 11, counsel for GreenFuels informed Aik Chuan that it would be conducting a foreclosure sale "pursuant to the Deed of Trust" of the Rockwood Plant on July 9.  The letter included a copy of the foreclosure sale notice and informed the defendant that the notice "will appear in THE ROANE COUNTY NEWS on June 18 and 25, 2021, and July 2, 2021."  The attached foreclosure sale notice, discussed further below, stated that the foreclosure sale would apply to the "property located at 397 Black Hollow Road, Rockwood, Tennessee 37854" (the Rockwood Plant) as well as "all of the right, title and interest of Global Energy Rockwood, LLC, in and to any tangible personal property or fixtures located on the above described real property."  Counsel for GreenFuels also provided notice of the July 9 foreclosure sale to each of the Global Energy entities.

In the period before foreclosure, Smith attempted to find alternate financing for the Rockwood Plant.  On June 14, Smith sent Virtus Holding Ltd. a letter highlighting the Rockwood Plant as "a unique opportunity to purchase a renewable diesel

fuel production facility in various stages of completion, with one of six modules completed." Smith explained that Kolmar had scheduled a foreclosure on the Rockwood Plant since there was a "non-curable default" and Aik Chuan had not assumed Global Energy's debt to GreenFuels. He concluded his letter by explaining:

> The opportunity is to show up on July 9th and bid more than Kolmar and take the property. There will also be a need for $5MM in working capital to start the plant back up and get the facility running at 70% uptime to get to balance of plant funding. This should take about 90 days.

On June 23, Global Energy presented Aik Chuan with another strategy. It explained in this email that, because the parties had failed to stop the foreclosure by attempting to get a temporary restraining order, their remaining option was to "outbid Kolmar on the court house steps." Again, there was no suggestion that an Event of Default had not occurred. Indeed, Global Energy was highly critical of Proton Power for providing a system that was not "commercially viable."

On July 1, GreenFuels sent Aik Chuan another letter explaining that Aik Chuan was required to take immediate assignment of the GreenFuels Loan and warned that GreenFuels would proceed with the foreclosure sale if Aik Chuan did not. The letter stated:

> Following its receipt of the Remedies Notice on June
> 3, 2021, the terms of Section 8.2 of the Subordination
> Agreement "obligated" Aik Chuan Construction Pte. Ltd.
> ("AK") to "immediately" take assignment of the
> Financing Documents in exchange for the payment to
> [GreenFuels] of cash consideration in the amount of
> the Outstanding Indebtedness.
>
> As of the date of this letter, AK has not taken
> assignment of the Financing Documents . . . . If AK
> does not take assignment of the Financing Documents
> and make the payment of the amount of the Outstanding
> Indebtedness to [GreenFuels] by July 7, 2021, then
> [GreenFuels] will mitigate its damages by proceeding
> with the scheduled foreclosure sale.  AK will be
> responsible to [GreenFuels] for any difference between
> the Outstanding Indebtedness and the amount obtained
> at the foreclosure sale.

(emphasis added).

On July 6, Aik Chuan responded by complaining that the foreclosure sale was "on such a short timeline," prior to resolving a dispute regarding the amount of the Outstanding Indebtedness, and without an appropriate valuation.  Aik Chuan did not take assignment of the Financing Documents.

IV.  Foreclosure Sale

The foreclosure notice and terms of the sale were posted in the Roane County News, a local newspaper, on June 18, June 25, July 2, 2021 (the "Foreclosure Notice").  The Foreclosure Notice advertised the foreclosure sale as both a "Foreclosure Notice and UCC Sale," listed the Rockwood Plant's location and boundary lines, and noted that any "tangible personal property or fixtures" would also be sold.

29

Prior to the foreclosure sale, Kolmar's CFO, Kevin Luddy, engaged in discussions with various entities, including Deutsche Bank, Resilient Energi, Abundia/Proton Power, and Alleo regarding their interest in becoming involved with or purchasing the Rockwood Plant.  Luddy also authorized two of those entities to visit the Site before the foreclosure sale.  None of these entities chose to attend the foreclosure sale.

The foreclosure was held, as noticed, on July 9, 2021 (the "Foreclosure Sale").  Representatives from Aik Chuan and Proton Power attended the auction.  GreenFuels made an opening bid of $1.7 million during the sale.  No other bids were entered.  As the sole bidder at the auction, GreenFuels purchased the property for $1.7 million.  Luddy had authorized GreenFuels to bid up to the total Outstanding Indebtedness, and GreenFuels intended to accept any bid for the total Outstanding Indebtedness.

GreenFuels applied the proceeds from the Foreclosure Sale against the GreenFuels Loan, and on July 19, 2021, sent Aik Chuan a letter demanding approximately $17.5 million to satisfy the Outstanding Indebtedness of the GreenFuels Loan, with interest accruing daily.  Aik Chuan has not made any payment to GreenFuels.

## Procedural History

GreenFuels filed this action on September 14, 2021, bringing a breach of contract claim against Aik Chuan pursuant to the Subordination Agreement for the Outstanding Indebtedness due under the Loan Agreement.  Aik Chuan answered the complaint on January 13, 2022, asserting counterclaims against GreenFuels and Kolmar for breach of the Subordination Agreement and the implied covenant of good faith and fair dealing, tortious interference with a contract, and breach of fiduciary duty.

GreenFuels and Kolmar each filed a motion to dismiss Aik Chuan's counterclaims on March 21, 2022.  In response, Aik Chuan filed amended counterclaims on April 22.  On May 13, Kolmar submitted a motion to dismiss the counterclaims, and GreenFuels submitted a motion to dismiss the counterclaims and strike Aik Chuan's first through ninth affirmative defenses.  On August 17, the case was reassigned to this Court.

On September 30, 2022, the motions to dismiss were largely denied.  Am. GreenFuels Rockwood (Tennessee), LLC v. Aik Chuan Constr. Pte. Ltd., 21cv7680 (DLC), 2022 WL 4629255 (S.D.N.Y. Sept. 30, 2022).  The claims against Kolmar were dismissed except with respect to Aik Chuan's claim for tortious interference with a contract.  See id. at *4.  Aik Chuan's breach of fiduciary duty claim was dismissed as against both

31

counterclaim defendants.  See id. at *9.  The parties engaged in discovery in the following months.

On August 25, 2023, the Court placed the case on the November 13, 2023 trial ready calendar.  Aik Chuan filed its proposed findings of fact and conclusions of law on October 20; GreenFuels and Kolmar did so on October 21.  The parties submitted their joint pretrial order on October 21.  Pursuant to this Court's Individual Practices in Civil Cases regarding non-jury trials and without objection by the parties, the parties offered the direct testimony of their witnesses at trial by affidavit.  These affidavits, along with the documents constituting the parties' evidence in chief, were submitted with the parties' other pretrial materials on October 20 and 21.

GreenFuels presented direct testimony from four fact witnesses: Kevin Luddy, Executive Vice President and CFO for Kolmar and its subsidiaries; David Astrauckas, a Renewables Business Manager/Trader for Kolmar; Alan Jay, General Manager of the Rockwood Plant for USP&E until September 2021, and current General Manager for GreenFuels; and Shane Terry, Supervisor and later Foreman at the Site for USP&E until September 2021, and currently GreenFuels' Plant Superintendent at the Site.  Aik Chuan presented direct testimony through affidavit from four fact witnesses: Sai Tiong Leow, Business Development Director

for Aik Chuan; Patrick Leow, Vice President of Operations for
ACGR USA LLC, a subsidiary of Aik Chuan; Tick Hoong Hooi,
Country Manager for ACGR USA LLC and Plant Manager of the
Rockwood Plant from October 2016 through March 2020; and Greg
Smith[5], the former President and CEO of Global Energy.  Aik Chuan
also presented testimony by affidavit of its expert witness,
Marc Brown, a Partner at AlixPartners, a financial and
operational consulting firm, and GreenFuels presented the
testimony of its rebuttal expert, Daniel Van Vleet, a Partner
and Managing Principal of The Griffing Group, LLC, a business
valuation consulting firm.  Additionally, the parties presented
testimony by deposition of Michael DiProspero, who performed two
appraisals related to the Rockwood Plant on behalf of
GreenFuels, and Will Gruver, the founder and CEO of USP&E
Global, the company that provided operations and maintenance
services at the Rockwood Plant for Global Energy.

A bench trial commenced on November 13 and concluded on
November 16.  The affiants were cross-examined and counsel
presented their summation arguments.

---

[5] Aik Chuan agreed to pay all of Smith's fees and expenses
related to this litigation.

## Conclusions of Law

There are very few factual disputes between the parties. Aik Chuan essentially raises only two defenses to GreenFuels' breach of contract claim. The first is that GreenFuels itself breached the Subordination Agreement when it declared an Event of Default. The second is that the Foreclosure Sale was not conducted in a commercially reasonable manner. GreenFuels prevails on both issues and is entitled to the benefits of the Subordination Agreement.

I.   Breach of Contract Claim Against Aik Chuan

GreenFuels asserts that Aik Chuan breached the Subordination Agreement when Aik Chuan failed to assume the Financing Documents from GreenFuels following its receipt of the Remedies Notice. GreenFuels asserts that, as a result of this breach, Aik Chuan is liable for Global Energy's Outstanding Indebtedness.

Aik Chuan acknowledges that it had a contractual obligation to assume the GreenFuels Loan in the event of a valid default but asserts that it did not do so because no Event of Default occurred. GreenFuels has shown that there was a valid Event of Default under the Loan Agreement when Global Energy failed to satisfy the Verification Provision of the GreenFuels Loan.[6]

---

[6] Because GreenFuels has succeeded in showing that an Event of Default occurred on the basis of one of the two grounds on which

Accordingly, Aik Chuan breached the Subordination Agreement by failing to assume the Financing Documents and pay the Outstanding Indebtedness.

A.   Legal Standards

Both the Loan Agreement and the Subordination Agreement include a New York choice-of-law provision.  Under New York law, a plaintiff bringing a breach of contract claim "must prove: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach."  Moreno-Goody v. Kartagener, 7 F.4th 78, 85 (2d Cir. 2021) (citation omitted). The burden of proof on a breach of contract claim is on the party asserting breach.  Id.  Likewise, "[t]he party seeking to enforce a contractual obligation generally bears the burden of proof with respect to a condition precedent."  Rachmani Corp. v. 9 E 96th St. Apt. Corp., 629 N.Y.S.2d 382, 386 (1st Dep't 1995). Accordingly, the burden of proof to show that a Default occurred under the terms of the Loan Agreement and that Aik Chuan breached the Subordination Agreement is on GreenFuels.

The law that governs the construction of a contract is well settled.  Under New York law, a contract "that is complete,

---

it gave notice, it is unnecessary to resolve whether Global Energy also triggered an Event of Default when it failed to maintain adequate liquidity.

clear and unambiguous on its face must be enforced according to
the plain meaning of its terms." Utica Mut. Ins. Co. v. Munich
Reinsurance Am., Inc., 7 F.4th 50, 56 (2d Cir. 2021) (citation
omitted).  Under New York law, a contract is unambiguous if its
language has "a definite and precise meaning, unattended by
danger of misconception in the purport of the contract itself,
and concerning which there is no reasonable basis for a
difference of opinion." Olin Corp. v. OneBeacon Am. Ins. Co.,
864 F.3d 130, 148 (2d Cir. 2017) (citation omitted).  "If the
terms of a contract are clear, courts must take care not to
alter or go beyond the express terms of the agreement, or to
impose obligations on the parties that are not mandated by the
unambiguous terms of the agreement itself." Steiner v. Lewmar,
Inc., 816 F.3d 26, 32 (2d Cir. 2016) (citation omitted); see
also Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004)
(citation omitted) (applying New York law).

     To determine whether disputed contract language is
ambiguous, a court must ask whether it is "ambiguous when read
in the context of the entire agreement." 32BJ N. Pension Fund
v. Nutrition Mgmt. Servs. Co., 935 F.3d 93, 100 (2d Cir. 2019)
(citation omitted); Law Debenture Tr. Co. of N.Y. v. Maverick
Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted)
(applying New York law).  "[W]here consideration of the contract

36

as a whole will remove the ambiguity created by a particular
clause, there is no ambiguity." Law Debenture Tr. Co., 595 F.3d
at 467 (citation omitted).  In interpreting contracts, "words
should be given the meanings ordinarily ascribed to them and
absurd results should be avoided." Mastrovincenzo v. City of
New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted)
(applying New York law).

     "[A] condition precedent is an act or event, other than a
lapse of time, which, unless the condition is excused, must
occur before a duty to perform a promise in the agreement
arises." Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg.
Cap., Inc., 821 F.3d 297, 305 (2d Cir. 2016) (citation omitted)
(applying New York law).  Under New York law, "express
conditions must be literally performed; substantial performance
will not suffice." In re Johns-Manville Corp., 759 F.3d 206,
214 (2d Cir. 2014) (citation omitted).

     "Under New York law, implicit in every contract is a
covenant of good faith and fair dealing which encompasses any
promises that a reasonable promisee would understand to be
included." JN Contemp. Art LLC v. Phillips Auctioneers LLC, 29
F.4th 118, 128 (2d Cir. 2022) (citation omitted).  This implied
covenant

          includes a promise that neither party to a contract
          shall do anything that has the effect of destroying or

37

> injuring the right of the other party to receive the
> fruits of the contract, or to violate the party's
> presumed intentions or reasonable expectations.

Id. (citation omitted).  As a corollary to the implied covenant

of good faith and fair dealing, "a party to a contract cannot

rely on the failure of another to perform a condition precedent

where he has frustrated or prevented the occurrence of the

condition."  Utica Mut. Ins. Co. v. Clearwater Ins. Co., 906

F.3d 12, 23 (2d Cir. 2018) (citation omitted) (applying New York

law).  Nevertheless, "under New York law, the implied covenant

of good faith and fair dealing cannot be used to impose an

obligation that is inconsistent with express contractual terms."

In Touch Concepts, Inc. v. Cellco P'ship, 788 F.3d 98, 102 (2d

Cir. 2015).

    Finally, under New York law, breach of the duty of good

faith and fair dealing "is merely a breach of the underlying

contract."  L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419,

434 n.17 (2d Cir. 2011) (citation omitted) (applying New York

law).  Thus, a claim for breach of the implied covenant of good

faith and fair dealing fails as redundant when both claims are

based on the same set of facts.  Id.

    B.   Application

        1.   Events of Default Under the Loan Agreement

    GreenFuels has proved that Global Energy failed to satisfy

the Verification Provision of the Loan Agreement.  The Loan

38

Agreement provides that an "Event of Default" has occurred if "[t]he Verification Date shall not have occurred on or prior to" May 31, 2021.  To meet the Verification Testing Criteria, Module 2 was required to operate and deliver "75% of Design Capacity" when operated in "Standard Operating Mode . . . for any consecutive thirty (30) day period."  Standard Operating Mode is "continuous, 24/7, operation."

The evidence establishes beyond any doubt that Module 2 did not and could not perform at the level required by the Loan Agreement as of May 31, 2021.  At no 30-day period prior to the Target Verification Date could Module 2 operate in Standard Operating Mode, much less achieve the 75% operating rate objective.  The Rockwood Plant faced a number of serious operating issues, the most complex of which was the tarring that prevented the module from operating continuously.  By April 2021, it was clear to all parties that significant additional time and money were required to alleviate the tarring issue and achieve continuous operation.  As a result, the Verification Provision of the Loan Agreement was not satisfied by May 31, 2021, and constituted a valid Event of Default.

Aik Chuan argues that GreenFuels failed to exercise good faith and fair dealing by manufacturing fictitious Events of

Default and that GreenFuels waived Global Energy's breach of the May 31, 2021 Verification Date.  Aik Chuan's defenses fail.

To begin with, the Subordination Agreement's waiver clause bars Aik Chuan from asserting this defense.  It provides, in pertinent part, that: "the Subordinated Creditor [Aik Chuan] . . . waives . . . any allegation . . . in Law or in equity . . . based on . . . unfairness, unclean hands or similar matter in relation to the Loans or any payment."  The waiver provision in the Loan Agreement also states that "[n]o failure or delay by Lender in exercising any right or power hereunder or under any other Financing Document shall operate as a waiver thereof . . . ."

In any event, Aik Chuan's claim that GreenFuels was responsible for the default fails.  This is a newly minted argument.  It has been manufactured to evade contractual obligations.  In none of their correspondence leading up to the Foreclosure Sale did Aik Chuan or Global Energy ever dispute that the failure to achieve Verification had occurred and that the failure constituted an Event of Default under the Loan Agreement.  Indeed, in his June 23, 2021 email, which was sent after Aik Chuan had failed to assume Global Energy's Outstanding Indebtedness, Smith complained to Aik Chuan that Proton Power's failures had created "massive delays" that caused Global Energy

40

"to default under the loan" and that Aik Chuan and Global
Energy's only remaining options were to seek a TRO to stop the
Foreclosure Sale or to "outbid Kolmar on the courthouse steps."

Aik Chuan has suggested that GreenFuels should have
requested Global Energy to begin the Verification Test before
May 1, 2021, and that it cannot complain in good faith when
Global Energy did not.  Aik Chuan has not shown that GreenFuels
breached any duty by not suggesting that Global Energy begin a
futile and costly process.  The duty to conduct the Verification
Test rested on Global Energy.  And it is undisputed that Module
2 could not have passed that Verification Test.  Indeed, it was
dangerous to operate Module 2, it had never been operated
"continuously," and its ability to produce any significant
quantity of renewable diesel remained unproven.

Aik Chuan next asserts that GreenFuels agreed with Global
Energy to a detailed remedial plan at the April 2021 Meeting, a
plan that could not be completed for months, if it succeeded at
all.  Aik Chuan argues therefore, that GreenFuels either waived
the right to enforce the May 31 Verification Date or acted in
bad faith in declaring an Event of Default for failure to pass
the Verification Test.  Aik Chuan suggested as well in its
summation argument that that agreement "procured" the Event of
Default since there could be no Verification Test while the

41

parallel piping was being installed.  This argument fails for
several reasons.  While GreenFuels was aware from the April 2021
Meeting of the plan for the piping improvements, it was also
aware that any proposed fix would not be instantaneous and would
require additional capital.  Proton Power's plan to create
parallel piping to permit the tar to be cleaned from Module 2
would have taken months to put in place.  GreenFuels' knowledge
of that workaround plan, and its failure to object to it at the
April 2021 Meeting, did not waive any of its rights under the
Subordination Agreement and is not evidence that it breached its
duty of good faith under the Agreement.  Moreover, as the Loan
Agreement explains in unambiguous terms, GreenFuels' rights are
not waived by any "failure or delay by [GreenFuels] in
exercising [those] right[s]."

     In any event, GreenFuels did not engage in any delay in
exercising its rights under the agreements.  It had already made
clear to Global Energy that it would not extend any further
bridge loan.  It began giving notice to the interested parties
of its determination that there had been an Event of Default on
May 4, 2021, and repeated that notification in the weeks that
followed.  During these weeks it tried to convince Aik Chuan to
give Global Energy the funds it desperately needed to pay its
workforce, buy more material, and repair Module 2.  Aik Chuan

refused to engage in these negotiations.  Thus, there is no evidence that GreenFuels acted in bad faith at any point, during or after the April 2021 Meeting.

GreenFuels was entitled to enforce its rights under the Subordination Agreement in June and to declare an Event of Default.  The implied covenant cannot be used to create an obligation where "a proposed implied term defeats a right that a party actually bargained for."  Spinelli v. Nat'l Football League, 903 F.3d 185, 206 (2d Cir. 2018).  Aik Chuan's effort to imply a term to the parties' contract -- that is inconsistent with GreenFuels' express rights under the contract to require the Verification of Module 2 by May 31, 2021 -- fails.

Finally, Aik Chuan argued in its pretrial submissions that GreenFuels breached the covenant of good faith and fair dealing by interfering with Global Energy obtaining additional funding from British Petroleum ("BP") in February 2021, from Silverpeak in April 2021, and from Resilient Energi in May 2021.[7]  This argument fails.  Most significantly, Aik Chuan has not shown that an infusion of additional funding from any source in the spring of 2021 would have allowed Global Energy to avoid an Event of Default.  The problems with the functioning of Module 2

---

[7] Aik Chuan appears to have abandoned this argument at trial.  It was not pursued during the examination of the plaintiff's witnesses nor discussed in summation.

were severe and Aik Chuan has not shown that access to
additional cash would have permitted the Verification Test to be
successfully completed by May 31, 2021.  Aside from this fatal
flaw, however, Aik Chuan has failed to show that GreenFuels
engaged in any wrongdoing.

GreenFuels objected in March of 2021 that Global Energy had
breached a duty of confidentiality by discussing an offtake
agreement with BP.  The assertion of its own contractual rights
is not evidence of wrongdoing by GreenFuels.  In April 2021,
Silverpeak, a third-party investor, requested that GreenFuels
pay Silverpeak's due diligence fees for a potential investment.
GreenFuels' refusal to do so breached no obligation to Global
Energy and was not wrongful.  Finally, in May 2021, Resilient
Energi advised Global Energy and GreenFuels that it did not have
cash available to invest but would be willing to search for
funding in exchange for a fee.  GreenFuels had no obligation to
pay those fees, and its refusal to do so violated no duty it
owed to Global Energy.

In sum, Aik Chuan has failed to show that GreenFuels
breached the covenant of good faith and fair dealing.  Although
GreenFuels provided additional funding to Global Energy on three
separate occasions in an effort to keep Global Energy afloat
through the verification phase, it was not obliged to extend

44

even more funds or to find additional funding for Global Energy. Aik Chuan has failed to show that any of GreenFuels' actions "frustrated or prevented" Global Energy from achieving the Verification of Module 2 by May 31, 2021.

   2.   Legality of the Foreclosure Sale

Aik Chuan's remaining affirmative defenses to GreenFuels' breach of contract claim relate to the Foreclosure Sale.  At bottom, Aik Chuan argues that GreenFuels failed to conduct the Foreclosure Sale in a commercially reasonable manner and that the foreclosure sale price of $1.7 million does not reflect the fair market value of the property sold.

As described below, Aik Chuan's argument regarding fair market value fails for several reasons.  But, first and foremost, there would have been no foreclosure sale if Aik Chuan had assumed Global Energy's obligations to pay GreenFuels, as the Subordination Agreement required Aik Chuan to do.  If Aik Chuan had not rejected its obligations under the Subordination Agreement, GreenFuels could not have proceeded with the Foreclosure Sale.  As Sai Tiong Leow admitted at trial, Aik Chuan understood this at the time.  Thus, Aik Chuan's own breach of the Subordination Agreement is the but-for cause of the Foreclosure Sale.  Putting aside this impediment, Aik Chuan has also failed to show that the Foreclosure Sale price of $1.7

million should not be used as the fair market value for the
property sold at the sale.

> i.    Governing Law

As a preliminary matter, the parties disagree over the law
which governs the Foreclosure Sale.  GreenFuels asserts that
Tennessee law applies to the Foreclosure Sale.  Aik Chuan agrees
that Tennessee real property law applies to the sale of the land
but argues that the UCC governs the sale of the personal
property on the land.

A court sitting in diversity must apply the choice of law
rules of the forum state.  Kinsey v. N.Y. Times Co. , 991 F.3d
171, 176 (2d Cir. 2021).  Under New York's choice of law rules,
courts "generally enforce choice-of-law clauses and [] contracts
should be interpreted so as to effectuate the parties' intent."
Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 51 F.4th
456, 472 (2d Cir. 2022) (citation omitted).

The foreclosure occurred pursuant to the Deed of Trust.
The Deed of Trust provides that, "[u]pon the occurrence and
during the continuance of an Event of Default Trustee shall have
the power to sell Deed of Trust Estate and property subject
hereto in accordance with the laws of the State of Tennessee,
having first given notice of such sale as then required by
applicable Law." (emphasis added).

Under Tennessee law, where a creditor seeks to recover a balance "still owing on an indebtedness after a . . . foreclosure sale of real property secured by a deed of trust . . . , the creditor shall be entitled to a deficiency judgment in an amount sufficient to satisfy fully the indebtedness." Tenn. Code Ann. § 35-5-117(a) (2021). "[A]bsent a showing of fraud, collusion, misconduct, or irregularity in the sale process, the deficiency judgment shall be for the total amount of indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale." Id. at § 35-5-117(b) (emphasis added).

There is a "rebuttable prima facie presumption that the sale price of the property is equal to the fair market value of the property at the time of sale." Id. A party may overcome that presumption by proving "by a preponderance of the evidence that the property sold for an amount materially less than the fair market value of property at the time of the foreclosure sale." Id. at § 35-5-117(c) (emphasis added). Tennessee courts recognize the statutory presumption of fair market value as a "difficult burden for the debtor to overcome," although they have "refrained from establishing a bright-line percentage, above or below which the statutory presumption is rebutted." Branch Banking & Tr. Co. v. Hill, 582 S.W.3d 221,

234-35 (Tenn. Ct. App. 2019) (citation omitted).[8]  Instead,
courts broadly consider "the condition of the property and any
other factors that may provide information concerning the
marketability of the property and the surrounding area."  Id.
(citation omitted).

In addition, Tennessee law sets out requirements for any
advertisement of a foreclosure sale.  Such advertisements shall:

> 1. Give the names of the plaintiff and defendant, or
> parties interested;
>
> 2. Give a concise description of the land; . . .
>
> 3. Mention the time and place of sale;
>
> 4. A. Identify each and every lien or claimed lien of
> the United States . . .
>
> 5. A. Identify each and every lien or claimed lien of
> the state . . .

Id. at § 35-5-104.

Under Article 9 of the UCC, "[e]very aspect of a
disposition of collateral, including the method, manner, time,
place, and other terms, must be commercially reasonable."  N.Y.
U.C.C. Law § 9-610(b).[9]  Where a security agreement covers both

---

[8] Tenn. Code Ann. § 35-5-117 was formerly Tenn. Code Ann. § 35-5-
118 and is referred to that way in Branch Banking, 582 S.W.3d
221.

[9] Aik Chuan admits that, were the UCC to apply, there are no
material differences between New York's version of the UCC and
Tennessee's version with respect to legal principles relevant to
this case.

48

personal and real property, however, a secured party may
proceed:

> (1) under [the UCC] as to the personal property
> without prejudicing any rights with respect to the
> real property; or

> (2) as to both the personal property and the real
> property in accordance with the rights with respect to
> the real property, in which case the other provisions
> of this part do not apply.

Id. at § 9-604(a) (emphasis added).

Under New York law, "fair market value" for purpose of a
damages calculation for a breach of contract claim, is "the
price at which the property would change hands between a willing
buyer and a willing seller, neither being under any compulsion
to buy or to sell and both having reasonable knowledge of
relevant facts." Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d
Cir. 2000) (citation omitted). "[A] recent sale price for the
subject asset, negotiated by parties at arm's length, is the
best evidence of [the asset's] market value." Id. "If no prior
sales history is available, experts may give their opinion of
the asset's value." Id.

### ii.   Application

Tennessee real property law applies to the sale of the
Rockwood Plant. The Deed of Trust covers both the personal and
real property sold through foreclosure and the Foreclosure Sale
involved the entirety of the Rockwood Plant. GreenFuels has

shown that the foreclosure sale complied with every aspect of
Tennessee real property law and, in any event, also met the
commercial reasonableness standard under the UCC that governs a
sale of collateral when it is sold separately from real estate.
See N.Y. U.C.C. Law §§ 9-610(b), 9-627(a)-(b).

GreenFuels gave timely notice of the Foreclosure Sale and
published it as required under Tennessee law.  The Foreclosure
Notice was published on three separate occasions in the local
newspaper.  Luddy engaged in discussions with various entities,
attempting to interest them in a purchase of the Rockwood Plant,
to no avail.  More importantly, however, GreenFuels provided
notice to the two companies with the greatest knowledge of the
Rockwood Plant's value: Aik Chuan and Proton Power.

As discussed above, at the time of the sale, the Rockwood
Plant was largely defunct -- Module 2 had yet to work as
intended, its construction and operation were plagued with
setbacks, Module 1 had been scrapped for parts, and the USP&E
workers had walked off the job.  Both Aik Chuan and Proton Power
had intimate knowledge of the state of the Rockwood Plant and
the very substantial problems with the pyrolysis process.  Both
attended the Foreclosure Sale and declined to bid.  GreenFuels
has shown that it is entitled to the presumption that the sale

price of the property of $1.7 million[10] is equal to the fair
market value of the property at the time of sale, and also that
that price was indeed the fair market value.  This finding is
reinforced by the fact that the attempts by Global Energy to
find a new financial partner for the plant failed, and the only
price at which there was a willing buyer was $1.7 million.

Aik Chuan makes several arguments in an effort to show that
the Foreclosure Sale was compromised by irregularities and that
the fair market value of the property sold through that sale was
approximately $107 million.  These arguments fail.

Aik Chuan first argues that the published notice was
deficient because it did not describe in detail the machinery or
fixtures at the Rockwood Plant.[11]  The Foreclosure Notice
included a "concise description of the land."  The Notice also
stated that the sale would include "any tangible personal
property or fixtures" at the Site.  This Notice complied with
Tennessee law.  Nothing more was required.

---

[10] GreenFuels set the price of $1.7 million after accounting for
liens and expenses of which it was aware at the time.  These
included a lien of $911,409.86 which USP&E placed on the
property and GreenFuels' estimated legal costs in pursuing Aik
Chuan in this litigation.

[11] Aik Chuan asserts that under UCC law, GreenFuels was required
to provide notice of the sale of the Collateral to USP&E.  As
discussed above, the applicable body of law for the sale is
Tennessee real property law.

Aik Chuan next complains that GreenFuels did not obtain an appraisal of the property before the sale.  There is no such requirement under the law.

Aik Chuan argues that GreenFuels' attempts to market the Rockwood Plant were deficient because it did not attempt to locate a buyer within the fuel industry.  This argument can be swiftly rejected.  GreenFuels had no obligation to market the Rockwood Plant to anyone but did so anyway.  Those efforts failed.  The Verification Test was critical to all major financers, and the Rockwood Plant had failed to achieve this critical proof of concept.

As for the sale price, Aik Chuan points out that it sold the Rockwood Plant to Global Energy just one year earlier for $85 million.  But, except for the $250,000 paid at closing, Global Energy paid no cash for the Rockwood Plant.  Instead, the remainder of the purchase price was reflected in the equity warrant and the Promissory Notes.  Thus, the face value of the Promissory Notes does not provide a basis to find that the fair market value in 2021 for a plant which had failed to pass the Verification Test can be set at $85 million in cash.

Finally, Aik Chuan argues that it has rebutted any presumption that $1.7 million was the fair market value for the Rockwood Plant.  It has offered one alternative calculation of

value.  It contends that the fair market value was $107 million because the Rockwood Plant was a "going concern" at the date of the sale.  Aik Chuan relies for this calculation on the testimony of its expert, who used Kolmar's projections of the Plant's profitability, to which he applied a conservative discounted cash flow analysis.  This approach is fundamentally flawed.

First, the Plant was not a going concern at the time of the sale.  It was a plant built for a novel, unproven technology that had disappointed its owners and operators time and again.  After seven years and tens of millions of dollars it consisted of only one module and that module could not be operated without risk to life, could not run continuously, and could not produce renewable diesel in commercial quantities.  This was not a going concern.  As defined by Aik Chuan's expert, value as a going concern "is the value in continued use, as a mass assemblage of income-producing assets, and as a going concern business enterprise."  The Second Circuit has likewise defined going concern as "the value of a commercial enterprise's assets as an active business with future earning power."  In re TransCare Corp., 81 F.4th 37, 52 (2d Cir. 2023) (citation omitted).  Since the Rockwood Plant was not an active business at the time of the Foreclosure Sale, it cannot be valued under the methodology that

applies to a going concern.  What existed, in essence, was an idea that needed significant additional cash infusions to see whether the idea could be realized.[12]

There is a second disqualifying flaw in the methodology employed by Aik Chuan's expert.  The Kolmar financial models upon which Brown's valuation is premised reflect a fully commercialized plant with an operating capacity of either six or eighteen modules.  The projections assume that Module 2 had passed the Verification Test and that many more identical modules had been constructed and were functioning at a commercial level.  Accordingly, Brown's analysis does not establish the fair market value of the Rockwood Plant as of the time of the Foreclosure Sale.

## II.  Aik Chuan's Counterclaims

Aik Chuan's counterclaims largely track its affirmative defenses to GreenFuels' breach of contract claim.  Aik Chuan asserts counterclaims against GreenFuels for breaches of the Subordination Agreement premised on its assertion of invalid Events of Default, conducting an illegal Foreclosure Sale, and violating the covenant of good faith and fair dealing.  For the

---

[12] It bears noting that after the Foreclosure Sale, Kolmar came to doubt that any renewable diesel could be produced through Module 2 and dismantled it.  As of the date of this trial, the renewable diesel pyrolysis technology has never been commercialized anywhere.

reasons already discussed, Aik Chuan's counterclaims are either duplicative of its failed affirmative defenses or not supported by the record.  They are rejected.

Aik Chuan's tortious interference claim, which is brought against both GreenFuels and Kolmar, is based on the contention that GreenFuels improperly interfered with the Promissory Notes that Global Energy had issued to Aik Chuan.  Aik Chuan contends that both GreenFuels and Kolmar interfered with those Notes by wrongfully declaring an Event of Default.[13]  It seeks damages in the amount of $117 million, which it calculates as the amount owed by Global Energy under the Promissory Notes.  This claim also fails.

A cause of action for tortious interference under New York law[14] requires: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of a third-party's breach of contract without justification, and (4) damages." Kaplan v. Reed Smith LLP, 919 F.3d 154, 160 (2d Cir. 2019) (citation omitted).  A plaintiff must show "that the

[13] Aik Chuan narrowed this claim significantly by the end of the trial, withdrawing the other theories of tortious interference it had once asserted.

[14] The parties have consented to the application of New York law to the tortious interference claim.

contract would not have been breached 'but for' the defendant's conduct." Rich v. Fox News Network, LLC, 939 F.3d 112, 127 (2d Cir. 2019) (citation omitted).  In response to such a claim, "a defendant may raise the economic interest defense -- that it acted to protect its own legal or financial stake in the breaching party's business."  White Plains Coat & Apron Co. v. Cintas Corp., 8 N.Y.3d 422, 426 (2007).  Without a showing of "malice or illegality," the economic interest defense acts as a complete bar to a tortious interference claim.  White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 283 (2d Cir. 2016).

Aik Chuan has failed to show that Kolmar and GreenFuels procured the Event of Default discussed in this Opinion -- the failure to pass a Verification Test by May 31, 2021 -- or to prove that it was damaged by GreenFuels declaring that default. First, as already explained, Kolmar's participation in the April 2021 Meeting did not "procure" Module 2's failure or the Event of Default.  Although Aik Chuan tried to suggest at trial that the plan for parallel piping discussed at the April 2021 Meeting interfered with Module 2 meeting the May 31, 2021 Verification Date, that argument is specious.  Module 2 was never able to operate continuously, safely, or commercially, and could not have passed the Verification Test by May 31, 2021.  Far from

56

procuring a breach, GreenFuels tried to assist Global Energy. It extended millions of dollars more to Global Energy in 2020 and 2021 than originally contemplated.

Moreover, in pursuing its tortious interference claim, Aik Chuan points to nothing more than GreenFuels' lawful exercise of its contractual rights. GreenFuels made an assessment that a further extension of its loan commitment to Global Energy was not prudent. It was entitled to declare a default.

The cases on which Aik Chuan relies do not suggest that any other conclusion is warranted. New York courts have expressly recognized that the economic interest defense may be applied "where defendant was the breaching party's creditor." White Plains Coat & Apron, 8 N.Y.3d at 426.

As for its claim for damages, Aik Chuan failed at trial to prove that the Rockwood Plant would ever have achieved commercial success or that Global Energy would ever had paid off the Promissory Notes. There is no evidence that the renewable diesel pyrolysis technology has reached commercialization anywhere as of today. And, as representatives for Aik Chuan admitted at trial, if Aik Chuan had assumed the Financing Documents, as Section 8.2 of the Subordination Agreement required, there would never have been a foreclosure sale and Global Energy would have continued to own the Rockwood Plant.

III. Damages

Having determined that Aik Chuan breached the Subordination Agreement, and that GreenFuels and Kolmar are not liable on its counterclaims, the sole remaining question concerns the amount of damages that Aik Chuan owes to GreenFuels.  GreenFuels calculates, correctly, that it is owed $28,494,451 as of November 16, 2023.

In making this calculation, GreenFuels relies on the provisions of its Loan Agreement with Global Energy, and Aik Chuan's commitment in the Subordination Agreement to "assume" the Financing Documents.  Under the Loan Agreement, in the Event of Default, Global Energy owes the principal of the loans, the 70% loan fee, accrued annual interest of 12%, and a post-default interest rate of 25% per annum.  If Aik Chuan had assumed the Financing Documents in June of 2021, it would have owed just over $19 million.  Today, the sum is roughly $28.5 million.

Aik Chuan asserts that the Subordination Agreement does not provide for interest of either 12% or 25% on the Outstanding Indebtedness and thus it owes no more than $19 million and pre-judgment interest.[15]  This argument fails.

The Subordination Agreement is clear.  It states that following an Event of Default and "[i]mmediately upon Lender's

---

[15] Aik Chuan does not contest the plaintiff's damages calculation if the Outstanding Indebtedness does bear interest.

issuance of the Remedies Notice, [Aik Chuan] will assume, and
agrees it is obligated to assume, the Financing Documents from
the Lender." GreenFuels agreed to assign the Financing
Documents to Aik Chuan at the time of assumption "in exchange
for cash consideration in the amount of the Outstanding
Indebtedness." (emphasis added). "Financing Documents" in the
Subordination Agreement incorporates the definition from the
Loan Agreement, which in turn includes the Loan Agreement, the
Collateral Documents, and the Subordination Agreement. Thus,
Aik Chuan is obligated to pay Global Energy's debt to
GreenFuels. As of November 16, 2023, that number is
$28,494,451.

## Conclusion

Aik Chuan breached the Subordination Agreement and is
liable to GreenFuels for the Outstanding Indebtedness in the
amount of $28,494,451 as of November 16, 2023. Judgment is
entered for GreenFuels and Kolmar on the defendant's
counterclaims.

Dated:    New York, New York
          November 20, 2023

DENISE COTE
United States District Judge